UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD BAGNALL, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| KATHLEEN SEBELIUS, Secretary of ) | Civil Action No. 3:11-CV-1703 (AWT) |
| Health and Human Services, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................... 1

I.   THE MEDICARE PROGRAM AND OBSERVATION STATUS ......................... 5

  A.  Medicare and its hospital benefit .......................................................... 5

  B.  Medicare's administrative review mechanism ........................................ 7

  C.  The real nature of observation status .................................................... 9

II.  THE RULE 12(b)(1) MOTION SHOULD BE DENIED BECAUSE THE
     COURT HAS JURISDICTION OVER THE CLAIMS. ........................................ 10

  A.  Exhaustion under 42 U.S.C. § 405(g) should be waived. ....................... 10

       1.   Collaterality ............................................................................. 12
       2.   "Colorable claim of irreparable harm" ...................................... 14
       3.   Futility ...................................................................................... 17

  B.  The plaintiffs have standing to seek the requested relief ....................... 19

  C.  Mandamus provides an alternative basis for jurisdiction ....................... 20

III. THE RULE 12(b)(6) MOTION SHOULD BE DENIED BECAUSE
     PLAINTIFFS HAVE STATED VALID CLAIMS .................................................. 21

  A.  Cause of action I is valid because the Secretary's classification of plaintiffs
      on observation status improperly unbundles the diagnostic services
      component of the Part A hospital benefit, thereby depriving plaintiffs of
      Part A coverage. ................................................................................... 22

  B.  Causes II and III are valid because the rulemaking provisions require notice
      and comment. ....................................................................................... 27

  C.  Cause IV is valid because the policy was not published in the Federal
      Register. ............................................................................................... 30

  D.  Cause V is valid because the deprivation of plaintiffs' Part A coverage by
      classifying them on observation status was arbitrary and capricious under
      the APA. ............................................................................................... 33

E.  Causes VI and VII are valid because existing notice and appeal practices for beneficiaries classified on observation status do not comport with the statute or due process.  ............................................................................. 35

    1.  The statute requires understandable and timely notice. .............................. 36
    2.  The statute requires an expedited appeal procedure. ................................... 39
    3.  The Secretary violates due process by failing to provide adequate notice and appeal rights to beneficiaries who have been classified on observation status.  .............................................................................. 41

F.  Causes VIII and IX are valid because the practice of classifying Medicare beneficiaries on observation status interferes with the practice of medicine.  ...................................................................................... 47

CONCLUSION.......................................................................................... 49

## TABLE OF AUTHORITIES

### Cases

*Abbey v. Sullivan*,
 978 F.2d 37 (2d Cir. 1992).............................................................................. 17

*Alaska Professional Hunters Ass'n, Inc. v. FAA*,
 177 F.3d 1030 (D.C.Cir. 1999) ....................................................................... 28

*Bldg. & Const. Trades Council of Buffalo, N.Y. and Vicinity v. Downtown Development,
 Inc.*,
 448 F.3d 138 (2d Cir. 2006)............................................................................. 20

*Bowen v. City of New York*,
 476 U.S. 467 (1986)................................................................ 12, 15, 17, 18

*Catholic Health Initiatives – Iowa, Corp. v. Sebelius*,
 --- F. Supp. 2d ---, 2012 WL 255275 (D.D.C. 2012)...................................... 1

*Cedars-Sinai Medical Center v. Shalala*,
 939 F.Supp. 1457 (C.D.Cal. 1996) ................................................................. 28

*Chen v. Slattery*,
 862 F.Supp. 814 (E.D.N.Y. 1994) .................................................................. 31

*Children's Hosp. of Buffalo v. Apfel*,
 110 F. Supp. 2d 158 (W.D.N.Y. 2000),
 aff'd, 2 Fed.Appx. 141 (2d Cir. 2001) .......................................................... 28

*City of Los Angeles v. Lyons*,
 461 U.S. 95 (1983)........................................................................................... 19

*City of New York v. Heckler*,
 578 F.Supp. 1109 (E.D.N.Y.), aff'd, 742 F.2d 729 (2d Cir. 1984),
 aff'd *sub nom. Bowen v. City of New York*, 476 U.S. 467 (1986) ............. 12, 13, 15, 20

*City of New York v. Heckler*,
 742 F.2d 729 (2d Cir. 1984), aff'd *sub nom. Bowen v. City of New York*, 476 U.S. 467
 (1986).............................................................................................. *passim*

*Comer v. Cisneros,*
   37 F.3d 775 (2d Cir. 1994)........................................................................................ 19

*Conn. Dept. of Social Services v. Shalala,*
   428 F.3d 138 (2d Cir. 2005), rev'g,
   242 F. Supp. 2d 127 (D.Conn. 2002)........................................................................ 20

*Conn. Dept. of Social Services v. Thompson,*
   242 F. Supp. 2d 127 (D.Conn. 2002), rev'd,
   428 F.3d 138 (2d Cir. 2005) ............................................................................... 13, 21

*David v. Heckler,*
   591 F.Supp. 1033 (E.D.N.Y. 1984) ................................................................... 14, 41

*Ellis v. Blum,*
   643 F.2d 68 (2d Cir. 1981)....................................................................................... 20

*Estate of Landers v. Leavitt,*
   545 F.3d 98 (2d Cir. 2008)................................................................................. 25, 26

*Forest Watch v. U.S. Forest Service,*
   410 F.3d 115 (2d Cir. 2005)..................................................................................... 33

*Fox v. Bowen,*
   656 F.Supp. 1236 (D.Conn. 1987) ........................................................... 13, 14, 15, 18

*Furlong v. Shalala,*
   238 F.3d 227 (2d Cir. 2001)............................................................................... 20, 42

*Ganem v. Heckler,*
   746 F.2d 844 (D.C.Cir. 1984) ................................................................................. 21

*Goodman v. Sullivan,*
   891 F.2d 449 (2d Cir. 1989)..................................................................................... 49

*Gray Panthers v. Schweiker,*
   652 F.2d 146 (D.C. Cir. 1980) .......................................................................... 41, 45

*Grijalva v. Shalala,*
   946 F.Supp. 747, 755 (D. Ariz. 1996), aff'd, 152 F.3d 1115 (9th Cir. 1998), vacated,
   526 U.S. 1096 (1999)............................................................................................... 41

*Grijalva v. Shalala,*
   152 F.3d 1115 (9th Cir. 1998), vacated,
   526 U.S. 1096 (1999)......................................................................................... 44, 45

*Heckler v. Ringer*,
466 U.S. 602 (1984) ................................................................................ 14

*Jones v. Califano*,
576 F.2d 12 (2d Cir. 1978) ................................................................ 16, 17

*Knuckles v. Weinberger*,
511 F.2d 1221 (9th Cir. 1975) ................................................................ 21

*Kraemer v. Heckler*,
737 F.2d 214 (2d Cir. 1984) ............................................................. 41, 43

*Landers v. Leavitt*,
232 F.R.D. 42 (D.Conn. 2005) ..................................................... 13, 16, 18

*Linoz v. Heckler*,
800 F.2d 871 (9th Cir. 1986) ........................................................... 27, 31

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................................ 19

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ................................................... 11, 18, 42, 43

*Metz v. U.S. Life Ins. Co. in the City of New York*,
662 F.3d 600 (2d Cir. 2011) .................................................................... 21

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
463 U.S. 29 (1983) .................................................................................. 33

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ................................................................................ 19

*Raila v. United States*,
355 F.3d 118 (2d Cir. 2004) .................................................................... 10

*Riverkeeper, Inc. v. U.S. Environmental Protection Agency*,
358 F.3d 174 (2d Cir. 2004) .................................................................... 33

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) .................................................................... 19

*Rural Cellular Ass'n v. Federal Communications Comm'n*,
588 F.3d 1095 (D.C.Cir. 2009) ............................................................... 33

*Shalala v. Guernsey Memorial Hosp.*,
514 U.S. 87 (1995)..............................................................28

*Shalala v. Illinois Council on Long Term Care, Inc.*,
529 U.S. 1 (2000)..............................................................20

*State of New York v. Lyng*,
829 F.2d 346 (2d Cir. 1987)..............................................31

*State of New York v. Sullivan*,
906 F.2d 910 (2d Cir. 1990).................................. 12, 13, 14, 15, 17

*Sweet v. Sheehan*,
235 F.3d 80 (2d Cir. 2000)..............................................28

*31 Foster Children v. Bush*,
329 F.3d 1255 (11th Cir. 2003) ............................................19

*Vorster v. Bowen*,
709 F. Supp. 934 (C.D. Cal. 1989) ......................................41

*Waterkeeper Alliance, Inc. v. U.S. Environmental Protection Agency*,
399 F.3d 486 (2d Cir. 2005)..............................................33

*Weinberger v. Salfi*,
422 U.S. 749 (1975)..............................................17

*Yale-New Haven Hosp. v. Leavitt*,
470 F.3d 71 (2d Cir. 2006).................................................29

**Statutes**

5 U.S.C.
§ 552(a)(1) ..........................................................32
§ 552(a)(1)(D)..............................................30, 31, 32
§ 553..............................................27, 28
§ 553(b)..........................................................29
§ 706(2)(A) ......................................................32

28 U.S.C.
§ 1331..........................................................3, 4, 20
§ 1361..........................................................3, 4, 20

42 U.S.C.
§ 405(g)................................................3, 10, 11, 20, 21
§ 405(h)..........................................................20

§ 1395.................................................................................................................. 47
§ 1395d(a)(1) ...................................................................................................... 6
§ 1395d(a)(2)(A)................................................................................................. 6
§ 1395e................................................................................................................ 5
§ 1395w-22(g)(1)(B)........................................................................................... 7
§ 1395w-22(g)(5) ............................................................................................... 3
§ 1395x(b) .......................................................................................... 10, 23, 24, 25
§ 1395x(b)(4) ..................................................................................................... 23
§ 1395x(b)(5) ..................................................................................................... 23
§ 1395x(e)(1) ..................................................................................................... 23
§ 1395x(i)........................................................................................................ 6, 26
§ 1395x(s)(2)(C) ................................................................................................ 24
§ 1395cc(a)(2)(A) ............................................................................................... 5
§ 1395ff ......................................................................................................... 7, 36
§ 1395ff(a) ......................................................................................................... 36
§ 1395ff(a)(4) ...................................................................................................... 7
§ 1395ff(a)(4)(A) ............................................................................................... 37
§ 1395ff(a)(4)(B) ............................................................................................... 37
§ 1395ff(b) ......................................................................................................... 36
§ 1395ff(b)(1)(A) ................................................................................................ 3
§ 1395ff(b)(1)(F)............................................................................................ 7, 39
§ 1395ff(b)(1)(F)(i) ........................................................................................... 37
§ 1395hh(a)(2) ....................................................................................... 27, 29, 30
§ 1395pp(a) ....................................................................................................... 46
§ 1395ddd ......................................................................................................... 48

**Regulations**

42 C.F.R.

§ 405.900.......................................................................................................7, 36
§ 405.921(a)(2) .............................................................................................. 7, 37
§ 405.924(b)(11) ............................................................................................... 38
§§ 405.1200-.1206 ........................................................................................ 7, 39
§ 405.1205(b) .................................................................................................... 46
§ 405.1205(b)(1) ............................................................................................... 38
§ 405.1205(b)(2)(i) ........................................................................................... 38
§ 405.1206.......................................................................................................... 46
§ 405.1206(a) .................................................................................................... 38
§ 409.10(a) ........................................................................................................ 23
§ 422.111(b)(8) ................................................................................................... 7
§ 422.562(a)(2)(i) ............................................................................................... 7
§ 422.562(b)....................................................................................................... 7
§ 482.12(c)(1) ................................................................................................... 49
§ 482.30(b) ........................................................................................................ 49
§ 482.30(d)(3) ................................................................................................ 8, 38

**Rules**

Federal Rules of Civil Procedure
    Rule 12(b)(1)..............................................................................................3, 10
    Rule 12(b)(6)..............................................................................................3, 21

**Miscellaneous**

Federal Register
    70 Fed.Reg. 29070 (May 19, 2005) ...........................................................6, 34
    70 Fed.Reg. 45026 (Aug. 4, 2005)..............................................................34
    65 Fed.Reg. 18434 (Apr. 7, 2000) .............................................................30
    63 Fed.Reg. 47552 (Sept. 8, 1998) ............................................................30

Medicare Benefit Policy Manual, CMS Pub. No. 100-02,
    ch. 1, § 10..................................................................................................25
    ch. 6, § 20.6.A ...........................................................................................26

Medicare Claims Processing Manual, CMS Pub. 100-04,
    ch. 21, § 10..................................................................................................7
    ch. 30, § 200.1 ......................................................................................37, 38
    ch. 30, § 200.2 ...........................................................................................38
    ch. 30, § 200.4 ...........................................................................................39

S. Rep. No. 89-404, 89th Cong., 1st Sess. (1965) .......................................6, 34

**INTRODUCTION**

Chief Judge Lamberth of the District Court for the District of Columbia recently made this observation: "Picture a law written by James Joyce and edited by E.E. Cummings.  Such is the Medicare statute, which has been described as among the most completely impenetrable texts within human experience."  *Catholic Health Initiatives – Iowa, Corp. v. Sebelius*, --- F. Supp. 2d ---, ---, 2012 WL 255275 at *1 (D.D.C. 2012) (internal quotation marks, citation, and footnote omitted).  Had the judge been aware of "observation status," he might have added Lewis Carroll to the list of Medicare's contributing authors, for the premise that hospitalized Medicare beneficiaries are not in fact hospitalized would fit neatly into Alice's Wonderland.

This case challenges the defendant Secretary's policy of using observation status, which is a billing procedure, to deprive thousands of Medicare beneficiaries annually of Part A coverage for their hospitalization and to deny coverage of their follow-up nursing home care.  It is based on the fiction that, despite being hospitalized over night, and often for many nights, in hospital beds where they receive the same hospital level of care and services that are furnished to formally admitted patients, these beneficiaries are merely being observed.  Without statutory or regulatory support, the Secretary treats beneficiaries in observation status, who may be hospitalized for days, or weeks in some cases, as outpatients.  As a result of their fictive status as outpatients, beneficiaries are covered under Medicare Part B rather than Part A.  This classification has disastrous financial effects for the beneficiaries and their families, and, if the cost of skilled nursing care is prohibitive, it may have life-threatening health consequences.

The situations of the seven individuals who brought this case (either on their own

or through their estates) demonstrate the deleterious impact of the observation status fiction.  See Complaint (doc. # 1), ¶¶ 56-95.  Richard Bagnall was hospitalized for three days, but, because he was considered to be on observation status, his Part B coinsurance payments amounted to about $500 and he was forced to pay $5,685 for his subsequent two-week stay in a nursing home.  Mildred Savage spent five days on observation status, which resulted in about $400 for Part B coinsurance and prevented coverage for a nursing home stay that cost over $17,000.  Lawrence Barrows was on observation status for the entire week of his hospitalization, leading to a nursing home bill of over $30,000 and about $400 in Part B coinsurance.  Charles Renshaw was hospitalized for four days, all on observation status, which imposed the $4,725 cost for subsequent nursing home care on him and his family.  Sarah Mulcahy also spent four days in the hospital, all on observation status, creating $335 in Part B coinsurance payments and about $30,000 for her subsequent nursing home stay.  Nettie Sapp was on observation status for all five days of her hospitalization, leading to Part B coinsurance costs of $575, a $9,200 nursing home bill, and her move to an assisted living facility because she and her family could not afford additional nursing home costs.  Ms. Sapp died in the assisted living facility. Florence Coffey was hospitalized, but on observation status, for three days, which led to $560 in Part B coinsurance payments and a nursing home bill of almost $30,000.

The Secretary has refused to recognize the drastic impact of her persistent and increasing reliance on observation status to undercut beneficiaries' right to Part A coverage of their hospitalization.  According to the Secretary's own policy manuals, observation status is supposed to last only 24 hours, occasionally up to 48 hours, and only rarely more than that.  But the number of claims for observation status and the average

2

period of time that beneficiaries spend on observation status are both increasing dramatically.  The Medicare Payment Advisory Commission, which advises Congress on Medicare matters, recently concluded that, in 2006 8% of observation status claims were for periods of over 48 hours and that, by 2008, the percentage was up to 12.  Complaint, ¶ 49.  That is, three years ago almost one in eight instances of observation status were for periods lasting more than two days.

In light of the increasing harm to Medicare beneficiaries and their families, plaintiffs filed the complaint on behalf of themselves and the thousands of other Medicare beneficiaries harmed by the fiction of "outpatient" observation status.  In seven claims, plaintiffs assert that the deprivation of Part A coverage violates the Medicare statute in four respects, the Administrative Procedure Act in two respects, and the Freedom of Information Act.  In their other two claims, plaintiffs contend that the Secretary's denial of notice and the right to expedited review when a beneficiary is placed on observation status violates the Medicare statute and the Due Process Clause. Plaintiffs contend that this Court has jurisdiction under the Social Security Act review provision, 42 U.S.C. § 405(g) (which is incorporated into the Medicare statute by 42 U.S.C. §§ 1395ff(b)(1)(A) and 1395w-22(g)(5)), and also under the federal question statute, 28 U.S.C. § 1331, and the mandamus statute, 28 U.S.C. § 1361.

The Secretary's Motion to Dismiss is a two-fold attack on the complaint.  The Rule 12(b)(1) portion of the motion contends that the claims of six of the seven named plaintiffs should be dismissed for failure to exhaust administrative remedies and that mandamus jurisdiction is not available.  The Secretary argues that the seventh plaintiff lacks standing.  In the Rule 12(b)(6) portion of her motion, the Secretary asserts that the

plaintiffs cannot prevail, as a matter of law, on any of their nine claims.

As the Supreme Court and the Second Circuit have consistently held, in cases of this nature, where the issue is the validity of the Secretary's policy rather than application of policy to the facts of an individual case, exhaustion should be waived. Moreover, plaintiffs' claims of jurisdiction under 28 U.S.C. §§ 1331 and 1361 were made in the alternative, as the Second Circuit has indicated is appropriate. The Secretary's standing argument is also in error. Furthermore, plaintiffs' claims for relief are on solid ground legally, as they will explain.

This case raises important issues for Medicare beneficiaries and their families. By definition, hospitalized Medicare beneficiaries are struggling with the combined impact of old age and/or a disability, an illness or injury that requires hospital care, and the ever-mounting costs of hospitalization and nursing home care. On top of these debilitating problems the beneficiaries are suddenly faced – often, as they are leaving the hospital – with the surprising information that they were not in fact hospital inpatients, and that Medicare will not cover the nursing home care they need for a full recovery. In most instances, they do not receive notice of their status as observation outpatients while hospitalized and have no right to challenge that designation, leaving them with the choice of astronomical nursing home bills or forgoing that necessary care.

As in other cases where the Secretary's policies are at issue, plaintiffs should be allowed to carry out discovery and demonstrate the validity of their claims. Dismissal of these claims would run contrary to the substantial case law that has ensured review on the merits of the Secretary's policies and practices.

## I.      THE MEDICARE PROGRAM AND OBSERVATION STATUS

### A.      Medicare and its hospital benefit

Medicare, which is codified as Title XVIII of the Social Security Act (42 U.S.C. § 1395 *et seq.*), is the federally funded and administered program of health insurance for those who are 65 and over or significantly disabled.  Under Part A of Medicare, for which eligibility is automatic for recipients of Social Security old age and disability benefits (Title II of the Social Security Act), beneficiaries are entitled to coverage for hospital care, skilled nursing facility (SNF) care, home health care, and hospice services.  Part B establishes a voluntary program of supplemental medical insurance providing coverage for physician services, nurse practitioner services, home health care, physical, speech and occupational therapy, diagnostic services, and durable medical equipment.  Under Part C (the Medicare Advantage or MA program), beneficiaries may opt to receive coverage through a managed care plan in lieu of "original Medicare," which is provided in Parts A and B.[1]

As the Secretary notes, a hospital inpatient pays a deductible under Part A for the first 60 days in the hospital.  42 U.S.C. § 1395e.  See Memorandum in Support of Motion to Dismiss (hereinafter, "Def. Mem.") at 5.  Under Part B, by contrast, the beneficiary must make a co-payment for individual covered services received.  42 U.S.C. § 1395cc(a)(2)(A).  Since outpatient services are covered under Part B and the Secretary considers classification on observation status an outpatient service, beneficiaries on observation status are responsible for Part B co-payments for services furnished in the hospital.

---

[1]  Part D provides for coverage of prescription drugs and is not at issue in this case.

Furthermore, as a component of the hospital benefit under Part A, follow-up care in a SNF is part of the continuum of coverage for an acute event, is denoted "post-hospital extended care services," and is codified as a subsection of the hospital benefit. 42 U.S.C. §§ 1395d(a)(1) and (2)(A).  The purpose of covering SNF care in this context is to extend the acute care provided in the hospital in a less expensive setting.  S. Rep. No. 89-404, 89th Cong., 1st Sess. (1965), reprinted in [1965] U.S.C.C.A.N. 1943, 1971.

As a condition of this SNF coverage the beneficiary must have been an inpatient for at least three consecutive calendar days prior to discharge from the hospital.  42 U.S.C. § 1395x(i).  This three-day requirement was intended, as the Secretary has explained, "to target the SNF benefit more effectively at the limited segment of the nursing home population that the benefit was actually designed to cover (that is, those beneficiaries requiring a short-term fairly intensive stay in a SNF as a continuation of an acute hospital stay of several days)."  70 Fed.Reg. 29070, 29099 (May 19, 2005).

The trigger for the SNF coverage, therefore, was a defined period of hospitalization, as the legislative history specifically noted: "The posthospital extended care benefits … would cover care in qualified extended care facilities where the patient was *hospitalized* for 3 or more consecutive days …."  S. Rep. No. 89-404, *supra*, reprinted in [1965] U.S.C.C.A.N. at 1971 (emphasis added).  Congress was focused on the beneficiary's need for follow-up care to hospitalization.  Since observation status did not exist in 1965 when Medicare was passed with SNF coverage as part of the hospital benefit, 70 Fed.Reg. at 29099, Congress could not have foreseen this reliance on a billing fiction to deprive beneficiaries of follow-up SNF coverage.

6

**B.**   **Medicare's administrative review mechanism.**

As in all federal benefit programs, Medicare beneficiaries receive written notification of adverse action involving coverage that is to be taken against them.  See, *e.g.,* 42 U.S.C. §§ 1395ff(a)(4), 1395w-22(g)(1)(B).  The notification advises them of their right to administrative review, including expedited review, and the steps to be taken to effect that review.  42 U.S.C. §§ 1395ff(a)(4), 1395w-22(g)(1)(B); 42 C.F.R. §§ 405.921(a)(2), 422.111(b)(8), 422.562(a)(2)(i), 422.562(b).  Under the standard review process, the notification of an "initial determination" is provided in the Medicare Summary Notice (MSN), which the Secretary issues on a quarterly basis and which summarizes all the coverage activity for that beneficiary for the last three months.  See Medicare Claims Processing Manual, CMS Pub. 100-04, ch. 21, § 10 (https://www.cms.gov/manuals/downloads/clm104c21.pdf.).  The beneficiary may seek redetermination and reconsideration, and ultimately review by an administrative law judge (ALJ) and the Medicare Appeals Council (MAC) if she meets the amounts in controversy.  42 U.S.C. § 1395ff; 42 C.F.R. § 405.900 *et seq.*

For discharges from a SNF, hospital, home health care, or a hospice – situations that require a quick response because of the immediate need for care – the provider must generally give two days' notice before the discharge is to take place, and the beneficiary may request an expedited determination by noon of the next day (or by midnight of the day of discharge for hospitals), and, if necessary, reconsideration of that determination by noon of the following day.  42 U.S.C. § 1395ff(b)(1)(F); 42 C.F.R. §§ 405.1200-.1206.

No such rights exist for hospitalized Medicare patients classified on observation status.  They do not receive notice that they have been so classified, even though the

effect of that treatment can be significant: increased liability for the hospitalization and the potential loss of coverage for the follow-up SNF care.  They can try to appeal from the MSN, which is the first formal notification that they were covered under Part B, but, if they were unable to pay for the SNF care, no relief is available.  Furthermore, the MSN usually does not state that they were classified on observation status or otherwise explain their peculiar situation.

Even if Medicare beneficiaries have paid for the SNF care and somehow determine that they should appeal the MSN notification, the Secretary takes the view that there is nothing to appeal since they were in fact covered under Part B.  See, *e.g.*, Complaint, ¶ 95 (Secretary rejected appeal for Ms. Coffey because the Part B claim was paid).  A few beneficiaries with experienced advocates have managed to appeal, but those without advocates have no chance and even those with advocates often find the path to review blocked on jurisdictional grounds.  See, *e.g.*, ALJ Decisions of plaintiffs Bagnall and Renshaw (doc. #'s 22-2 and 31-1).[2]

A regulation requires written notification to beneficiaries if the hospital's utilization review committee (URC) "decides that admission to or continued stay in the hospital is not medically necessary," 42 C.F.R. § 482.30(d)(3), but it is unclear whether this requirement applies when the URC decides that an admitted beneficiary should be retroactively reclassified on observation status.  In any event, the notification does not inform beneficiaries of appeal rights or indicate that they may challenge their observation status classification, nor is it written to be understood by Medicare beneficiaries.

---

[2]  Because there is no recognized route for administrative review, the favorable decision by the MAC in Mr. Barrows's case may be the only MAC decision ever issued reversing an observation status classification.  See MAC Decision of Dec. 7, 2011 (doc. # 22-1).  Plaintiffs are seeking information about other decisions in their written discovery.

Complaint, ¶ 44.  Furthermore, plaintiffs believe and have alleged that even this inadequate notification is rarely provided.  *Id*.

For all practical purposes, Medicare patients placed on observation status receive either untimely and inadequate notification or no notification at all, and have no access to administrative review, expedited or otherwise.

### C.   <u>The real nature of observation status</u>

The Secretary contends that classification on observation status is distinguishable from admission as an inpatient because, although the Medicare statute does not define "inpatient," "[t]he word 'inpatient' in the relevant section of the Medicare Act means admitted to the hospital as an inpatient."  Def. Mem. at 3.  Since physicians admit some patients and classify some on observation status, she argues, there is a distinction between those admitted and those on observation status.  *Id*. at 3-4, 6.  This is boot-strapping – in effect, they are inpatients because they are admitted as inpatients – and it ignores the reality of both the admitting process and the nature of the care provided.

The Medicare Benefit Policy Manual describes observation status or observation services, and how the decision should be made (see Def. Mem. at 6), but, as plaintiffs allege, the Manual does not recognize what happens in practice.  Doctors sign orders given to them by the hospitals, which make the decision on whether to admit based on commercially available screening tools.  These screening tools are used by reviewing entities known as Recovery Audit Contractors to evaluate the propriety of hospital admissions.  If it is determined after the fact that the admission was improper, the hospital is not only not reimbursed under Part A, but it also cannot rebill under Part B.  Moreover, the hospital could be accused of fraud.  As a consequence, hospitals have a

significant incentive not to admit a patient if there is any chance of later being reversed on that decision.  It is not surprising, then, that hospitals use the same screening tools as the contractors.  See Complaint, ¶¶ 40, 46.  Nor is it surprising that both the designation of observation status and its average length are increasing dramatically.  See *id.*, ¶¶ 45, 48, 49; see also *id.*, ¶ 47 (Affordable Care Act's penalty for readmissions creates additional incentive to classify on observation status).

Moreover, as plaintiffs have alleged (*id.*, ¶ 37), patients on observation status are receiving the same care and services as those formally admitted as inpatients.  Indeed, the MAC, the Secretary's highest level of administrative review, has recognized that precise point: "It is significant to note that Medicare's inpatient vs. outpatient distinction primarily relates to the amount of payment and coverage under the inpatient and outpatient prospective payment systems, and not to the type of care required and received."  MAC Decision for Barrows, at 9 (doc. # 22-1).  Since the services for an inpatient (see 42 U.S.C. § 1395x(b)) are regularly furnished to beneficiaries classified on observation status, there is no practical difference between inpatient admission and observation status – except in the latter's deprivation of coverage under Part A.

## II.   THE RULE 12(b)(1) MOTION SHOULD BE DENIED BECAUSE THE COURT HAS JURISDICTION OVER THE CLAIMS.

When reviewing a motion to dismiss under Rule 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff."  *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004).

### A.   Exhaustion under 42 U.S.C. § 405(g) should be waived.

The Secretary sets out some of the basics of the rules relevant to claims brought pursuant to 42 U.S.C. § 405(g).  Def. Mem. at 10-13.  She then states without discussion

10

that all but one of the plaintiffs have failed to exhaust.  *Id.* at 14.  In this cursory

observation, she fails to acknowledge that waiver of exhaustion is well established in

cases, like this one, that challenge a policy of the Secretary, as opposed to those applying

a standard or rule to the facts of an individual claimant.[3]

The so-called "final decision" requirement of 42 U.S.C. § 405(g) establishes that

presentment of the claim is jurisdictional and non-waivable, while exhaustion of

administrative remedies is waivable.  *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976).

The Secretary contends that the Court lacks § 405(g) jurisdiction over six of the named

plaintiffs (all but Lee Barrows) because they have not exhausted.  For those six, however,

exhaustion should be waived and jurisdiction therefore lies under § 405(g).

By ignoring the possibility of waiver, the Secretary avoids discussing the three

factors relevant to waiver – usually referred to as collaterality, futility, and irreparable

harm – and how they are analyzed.  The Second Circuit has long held, and the Supreme

Court has confirmed, that "no one factor is critical ….  We have adopted a more general

approach, balancing the competing considerations to arrive at a just result under the

circumstances presented."  *City of New York v. Heckler*, 742 F.2d 729, 736 (2d Cir. 1984)

(citation omitted), aff'd *sub nom. Bowen v. City of New York*, 476 U.S. 467 (1986).  In

unanimously affirming, the Supreme Court elaborated on the point, explaining that

collaterality and irreparable harm, the two factors identified in *Eldridge*, had to be

considered in light of the fact that "the exhaustion doctrine is intensely practical ….  The

---

[3]  The Secretary's undeveloped suggestion that plaintiffs were required to raise in the
administrative process their precise claims now presented to this Court (see Def. Mem. at
14 n. 4) was rejected by the Supreme Court over 35 years ago.  *Mathews v. Eldridge*, 424
U.S. 319, 329-330 (1976).  Plaintiffs' obligation was to present their claims to the
Secretary, not to detail the various arguments for rejecting the Secretary's decision.

ultimate decision of whether to waive exhaustion should not be made solely by mechanical application of the *Eldridge* factors, but should also be guided by the policies underlying the exhaustion doctrine." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986); see also, *e.g., State of New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990). In short, the goal of the waiver inquiry is to achieve a fair and rational result by balancing the relevant considerations, not by a simplistic recitation of the factors in a vacuum. In this case, all three factors favor waiver, but, even if they did not, it is clear that, given the plaintiffs' circumstances, waiver is the only fair resolution.

1.   Collaterality

The challenge in this case is not to the denial of coverage for an individual beneficiary, but to the policy that has been employed to deprive Medicare beneficiaries of their Part A hospital coverage. This is similar to the situation in *City of New York*, where people with disabilities were deprived of a full review of their claims for disability eligibility under the Social Security Act via a policy carried out "through internal memoranda, returns, and reviews." *City of New York v. Heckler*, 578 F.Supp. 1109, 1115 (E.D.N.Y.), aff'd, 742 F.2d 729 (2d Cir. 1984), aff'd *sub nom. Bowen v. City of New York*, 476 U.S. 467 (1986). The "procedural irregularity" in that case, which did not involve a ruling by the district court on the merits of any claims, was deemed "substantially collateral" to a claim for benefits by the Second Circuit. 742 F.2d at 737. The Supreme Court unanimously agreed: "The claims in this lawsuit are collateral to the claims for benefits that class members had presented administratively. The class members neither sought nor were awarded benefits in the District Court, but rather challenged the Secretary's failure to follow the applicable regulations." 476 U.S. at 483.

12

As in that case, the plaintiffs here are challenging a policy that precludes them both from having proper coverage determinations made and from obtaining review of the adverse coverage determinations.

*City of New York* is not the only case on point.  In *State of New York*, 906 F.2d at 915, the Secretary was improperly relying solely on treadmill tests, "to the exclusion of all other evidence," to make disability determinations for people with ischemic heart disease.  Since the plaintiff class was challenging that policy as in violation of the statute, "[t]he issue … was entirely collateral to [its] substantive claim of entitlement.  The basis for the claim was one of procedure since the class members neither sought nor were awarded benefits in the district court, but rather challenged the Secretary's failure to follow the applicable statutory mandate."  *Id*. at 918 (citations and internal quotation marks omitted; bracketed word in decision).

In *Fox v. Bowen*, 656 F.Supp. 1236, 1238 (D.Conn. 1987), Judge Cabranes, ruling in a statewide class action, considered a policy of the Secretary to terminate Medicare coverage for beneficiaries whose health status was stabilized and not improving.  Closely tracking the Second Circuit's *City of New York* analysis, he concluded that the class members' claims were "'substantially' collateral to their claims for benefits ….  Accordingly, the court holds that in this case, as in *City of New York*, 'the [plaintiff] class … complains fundamentally of a procedural irregularity and not of the Secretary's substantive standards of eligibility,' [742 F.2d] at 737."  656 F.Supp. at 1244.  See also*, e.g., Landers v. Leavitt*, 232 F.R.D. 42, 46 (D.Conn. 2005) (following *State of New York* to conclude that challenge to policy as contrary to statute renders the claim collateral); *Conn. Dept. of Social Services v. Thompson*, 242 F. Supp. 2d 127, 137-138 (D.Conn.

2002) (following *City of New York* to find a challenge to Medicare policy collateral when "plaintiffs attack several of the Secretary's alleged system-wide failures to follow his own regulations"), rev'd on other grounds, 428 F.3d 138 (2d Cir. 2005).

As this is not a challenge to errors in individual cases, the claims here are not like those in *Heckler v. Ringer*, 466 U.S. 602 (1984) (see Def. Mem. at 12, 13), in which the challenge was to a substantive denial of coverage.  Judge Cabranes rejected the *Ringer* analogy in *Fox*, 656 F.Supp. at 1244, as he recognized that the *Fox* plaintiffs were questioning the standard itself and neither were seeking benefits nor were guaranteed to obtain them if they prevailed.  See also, *e.g., David v. Heckler*, 591 F.Supp. 1033, 1039 (E.D.N.Y. 1984) ("The instant case is distinguishable [from *Ringer*] since plaintiffs seek prospective relief against a continuing illegal practice rather than specific benefits.").

The issue of collaterality in the context of a challenge to a policy or practice that runs contrary to controlling authority has been analyzed repeatedly in the Second Circuit, in its district courts, and in the Supreme Court.  Classifying hospitalized Medicare beneficiaries on observation status and therefore denying them Part A coverage, like the policies or practices in the cases discussed above, is a "procedural irregularity," and this challenge is therefore collateral to a claim for benefits.

2.    <u>"Colorable claim of irreparable harm"</u>

The second "*Eldridge* factor" requires showing "a colorable claim of irreparable harm."  *State of New York*, 906 F.2d at 918.  Plaintiffs have set out in detail the nature of their serious health problems, their advanced ages, their desperate need for health care, and the impact of the denial of Part A coverage on their ability to receive that care, especially in skilled nursing facilities. There can be no doubt that their health will suffer

14

if they are unable to obtain this care, even for a short period of time, and this is sufficient
to meet the low standard of a "colorable claim of irreparable harm."

In *City of New York*, the courts recognized that denial of disability benefits while
the administrative process was completed represented irreparable injury, which could not
be corrected by a later payment, and noted that the very fact of being forced through that
process could cause harm.  578 F.Supp. at 1118; 742 F.2d at 736; 476 U.S. at 483-484.
The Supreme Court added this significant observation: "We should be especially
sensitive to this kind of harm where the government seeks to require claimants to exhaust
administrative remedies merely to enable them to receive the procedure they should have
been afforded in the first place."  *Id*. at 484; see also *State of New York*, 906 F.2d at 918
(repeating that admonition).  That statement is directly applicable to the instant situation.

Other decisions also support the recognition that the harm to these plaintiffs is
irreparable.  In *State of New York*, 906 F.2d at 918, the Second Circuit noted that
"[d]enial of [disability] benefits potentially subjected claimants to deteriorating health,
and possibly even death," a possible outcome in these circumstances as well.  Judge
Cabranes followed the Second Circuit's *City of New York* analysis to conclude that there
was a colorable showing of irreparable harm: "Many of the plaintiffs who discontinued
their physical therapy prematurely so as not to exhaust their personal financial resources
will never be able to achieve as complete a recovery as would have been possible had
their benefits not been initially denied."  *Fox*, 656 F.Supp. at 1243-1244.  The same
problem exists for Medicare beneficiaries in this case, as is demonstrated by Ms. Sapp,
who was forced to leave the SNF because she could no longer afford to stay there.

Judge Cabranes also noted the irreparable harm to beneficiaries' health

occasioned by the very fact of having their benefits cut.  *Id*. at 1244.  That too is an obvious problem for the elderly and disabled beneficiaries in this case who are often not informed of their classification on observation status until they are leaving the hospital and suddenly discover that their expectation of coverage for their SNF care has been undercut by their designation on observation status.  See also, *e.g.*, *Jones v. Califano*, 576 F.2d 12, 20-21 (2d Cir. 1978) (in cash welfare program for the elderly and disabled, court follows *Eldridge* to find waiver of exhaustion, noting that "[f]or poor and elderly, time is a precious commodity even when the amounts involved are small"); *Landers*, 232 F.R.D. at 46 (in challenge to Medicare policy, court follows *State of New York*'s recognition of the possibility of "deteriorating health").

The problem is greatly exacerbated here because, except for the very few beneficiaries who have advocates able to challenge the system, there exists no realistic review of the denial of Part A coverage.  Moreover, the first formal notification (the MSN) of what has transpired occurs months after the event, in many instances after the beneficiary has left the nursing home (if she and her family could afford it), and does not suggest that the Part B designation is appealable.  The harm is not just to those who are unable to pay for SNF care, but for all the rest who manage to pay for it but can never be reimbursed because of the lack of review.

The courts have made it clear that, when welfare or health benefits for the poor, disabled, and elderly are at stake, irreparable harm is invariably incurred during the administrative exhaustion process.  That is certainly the case here, where the plaintiff beneficiaries are suffering from serious illnesses, are in need of the health care that Medicare coverage would provide for them, and, for all practical purposes, have no

opportunity to alter their observation status designation.

3.      Futility

Both "*Eldridge* factors" therefore favor waiver of exhaustion.  The third consideration to be balanced is usually given the short-hand designation "futility" but in fact raises "the policies underlying the exhaustion requirement."  *City of New York*, 476 U.S. at 484; see also, *e.g., Abbey v. Sullivan*, 978 F.2d 37, 45 (2d Cir. 1992) ("saying that exhaustion would be futile is merely another way of stating that the policies underlying the exhaustion requirement do not apply in a given case").  In cases of this nature, in which the challenge is to a policy or practice of the Secretary, it would be futile and counter to the purposes underlying the exhaustion requirement to require exhaustion.

The point of requiring exhaustion is to permit correction of individual errors in the administrative process by allowing the agency to compile an administrative record and to use its expertise accordingly.  *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975).  But individual facts are not at issue here; rather, the issue is the validity of a policy of the agency.  The courts have repeatedly recognized that, in these circumstances, "there was nothing to be gained from permitting the compilation of a detailed factual record, or from agency expertise."  *City of New York*, 476 U.S. at 485 (citation omitted).  That is because the claim at issue is not about eligibility but about requiring the agency to use the correct procedure.  The Second Circuit has consistently recognized this crucial point.  *State of New York*, 906 F.2d at 919; *City of New York*, 742 F.2d at 737; *Jones*, 576 F.2d at 20-21.

Plaintiffs' challenge cannot be corrected through individual eligibility determinations in the administrative process – even if, like Lawrence Barrows, they miraculously thread their way to an administrative victory on their claim for coverage.

17

See *State of New York*, 906 F.2d at 919 ("the procedural right that the claimants sought to obtain, personalized determinations, could not have been vindicated by individual eligibility decisions"); *City of New York*, 742 F.2d at 737 (the "procedural right, guaranteed by the Secretary's regulations, cannot be vindicated by an ultimate determination of eligibility"); *Fox*, 656 F.Supp. at 1244-1245 ("unrealistic …to 'expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient … in an adjudicatory context'") (quoting *Eldridge*, 424 U.S. at 33); *Landers*, 232 F.R.D. at 46 ("Exhaustion would be futile in the face of an agency policy irreversible by any individual Administrative Law Judge").

In *City of New York*, the Supreme Court also repudiated the suggestion that, because some claimants might prevail in the administrative process, exhaustion should not be waived.  Acknowledging that some might succeed, the Court stated that "[s]uch observations … merely serve to remind us why exhaustion is the rule in the vast majority of cases; they do not aid the Court in deciding when exhaustion should be excused."  476 U.S. at 486 (footnote omitted).  The fact that a few beneficiaries might struggle through the administrative process to ultimate success on their individual claims does not speak to the issue of correcting the policy that results in thousands of beneficiaries being deprived of coverage with little or no opportunity to seek review.

The "policies underlying the exhaustion requirement" favor waiver of exhaustion in this situation, as do both "*Eldridge* factors."  Even if each of the three factors is not fully met, balancing all the considerations must lead to waiver of exhaustion in this case, as it has in numerous similar cases in this Circuit.

18

**B.    The plaintiffs have standing to seek the requested relief.**

The Secretary briefly contends that Lee Barrows lacks standing because the MAC ruled that Mr. Barrows' stay was as an inpatient.  Def. Mem. 14.  That decision, however, does not defeat Ms. Barrows' standing because standing is determined by the plaintiff's situation at the time that the complaint was filed.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992); *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994); *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir. 1993).  There is no dispute that, when the complaint was filed, Ms. Barrows had standing to challenge the denial of Part A coverage.

The similar suggestion that none of the plaintiffs have standing to seek injunctive relief (see Def. Mem. at 16) is also in error.  First, a plaintiff's status as an estate is irrelevant.  The estates, like the living plaintiffs, have been deprived, and continue to be deprived, of Part A coverage, continue to suffer the harm that flows from that deprivation, and have no realistic ability to challenge that action administratively.  Only injunctive relief can correct the problem.  See *O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974) ("continuing, present adverse effects" from defendant's past conduct will support injunctive relief).  Second, standing to seek injunctive relief is also determined at the time of the complaint's filing, *Robidoux*, 987 F.2d at 938, and, upon the filing of the complaint, all the plaintiffs were subject to the challenged action denying them Part A coverage.  Third, for the plaintiffs who are alive, there is a significant likelihood, given their ages and the status of their health, that they will be hospitalized again, and thus subject to the challenged policy again.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *Robidoux*, 987 F.2d at 938; see also *31 Foster Children v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003) ("when the threatened acts that will cause injury are authorized or

part of a policy, it is significantly more likely that the injury will occur again").

At the pleading stage, the burden on plaintiffs to establish standing is at a minimum, with plaintiffs needing only to allege facts that establish a plausible claim to standing.  See, *e.g.*, *Defenders of Wildlife*, 504 U.S. at 561; *Bldg. & Const. Trades Council of Buffalo, N.Y. and Vicinity v. Downtown Development, Inc.*, 448 F.3d 138, 145 (2d Cir. 2006).  Plaintiffs have more than met that minimal obligation.

### C.  <u>Mandamus provides an alternative basis for jurisdiction.</u>

In an exercise of caution, and in the unlikely event that § 405(g) jurisdiction is unavailable, plaintiffs also alleged jurisdiction under 28 U.S.C. § 1331 and §1361.  See *City of New York*, 742 F.2d at 739.[4]  The Second Circuit and district courts in the Circuit have regularly recognized that mandamus lies in circumstances such as these, where the Secretary has failed to follow the law under the Social Security Act.[5]

The Secretary contends that plaintiffs do not satisfy any of the three conditions that must be met for mandamus jurisdiction to be authorized.  See *City of New York*, 742 F.2d at 739.  She states that plaintiffs have no clear right to the relief sought and that the Secretary has no duty to provide that relief.  Def. Mem. at 15.  But that is wrong. Plaintiffs contend that the Secretary's classification of Medicare beneficiaries on

---

[4]  The Secretary states that 42 U.S.C. § 405(h) always precludes § 1331 jurisdiction. Def. Mem. at 11.  The Secretary ignores the exception to that rule: the § 405(h) prohibition does not apply when its application "would mean no review at all."  *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000); see also, *e.g., Furlong v. Shalala*, 238 F.3d 227, 232-236 (2d Cir. 2001).  Accordingly, if no review is available under § 405(g), the Court would have jurisdiction under § 1331.

[5]  *Conn. Dept. of Social Services v. Shalala*, 428 F.3d 138, 143 n. 5 (2d Cir. 2005), aff'g on this point, 242 F. Supp. 2d 127, 140-142 (D.Conn. 2002); *Ellis v. Blum*, 643 F.2d 68, 78 (2d Cir. 1981) (Friendly, J.); *City of New York*, 578 F.Supp. at 1118.  Mandamus jurisdiction is not precluded by 42 U.S.C. § 405(h).  *City of  New York*, 742 F.2d at 739.

observation status, which deprives them of Part A coverage, violates the Medicare statute and other provisions. See *infra* at 22 ff. In *Conn. Dept. of Social Services*, 242 F. Supp. 2d at 140, Judge Underhill noted that "the thrust of the Amended Complaint is an attempt to force the Secretary … to comply with the alleged dictates of certain of the Medicare statute and regulations. Thus, on its face, the mandamus statute appears to confer jurisdiction." That is precisely the situation here. Although there could be a dispute over the nature of that obligation, once that is established the Secretary would have no discretion as to whether to carry it out. See, *e.g., Ganem v. Heckler*, 746 F.2d 844, 853 (D.C.Cir. 1984); *Knuckles v. Weinberger*, 511 F.2d 1221, 1222 (9th Cir. 1975).

The Secretary also contends that plaintiffs cannot show that no other adequate remedy exists. Def. Mem. at 15. The Secretary would be correct on that point if § 405(g) is available, but plaintiffs' argument for mandamus is based on the assumption that § 405(g) review is not available or is not adequate. In that event, and if no other basis for review exists, mandamus should lie.

At the pleading stage, the Court is not deciding that a writ of mandamus should issue, only that it could issue. Plaintiffs have made a sufficient showing at this stage, and the Court should invoke mandamus as an alternative ground for exercising jurisdiction.

### III.     THE RULE 12(b)(6) MOTION SHOULD BE DENIED BECAUSE PLAINTIFFS HAVE STATED VALID CLAIMS.

In considering a Rule 12(b)(6) motion, a court must accept as true all factual allegations and draw all reasonable inferences in the plaintiffs' favor. *Metz v. U.S. Life Ins. Co. in the City of New York*, 662 F.3d 600, 602 (2d Cir. 2011). The Secretary does not contend that plaintiffs have failed to plead sufficient facts, but, rather, that none of the nine causes of action can survive as a matter of law.

A. **Cause of action I is valid because the Secretary's classification of plaintiffs on observation status improperly unbundles the diagnostic services component of the Part A hospital benefit, thereby depriving plaintiffs of Part A coverage.**

The Secretary contends that she can properly designate the services furnished to plaintiffs as Part B outpatient services by using the observation status classification, and states in support that not all care provided in a hospital must be covered as inpatient services under Part A.  Def. Mem. at 17-18.  The latter point is correct, and plaintiffs are not contending that services such as stand-alone diagnostic tests should be covered under Part A simply because they occur in a hospital.  Beneficiaries like the plaintiffs, however, who receive the full range of inpatient hospital services (*e.g.*, bed and board, nursing services, medical treatment, medications, supplies and appliances, and social services), clearly fall under the Part A hospital benefit as enunciated in the statute.  Plaintiffs were not simply being observed to help physicians make a diagnosis or decide whether they should be formally admitted.  Plaintiffs allege that they were furnished an array of services for such serious conditions as atrial fibrillation and dehydration against backgrounds of severe medical problems such as metastatic breast cancer, Parkinson's disease, and muscular dystrophy.

As the Secretary points out, "[m]edicine is complicated science," *id.* at 1, and a doctor may need time to determine what is happening to a patient and make a diagnosis that leads to a course of treatment.  Part A includes coverage of such diagnostic services, but when those diagnostic services are part of the full range of inpatient services, such as bed and board, nursing services, supplies, appliances, drugs, and social services, the diagnostic component of Part A coverage should not be unbundled from the rest of that benefit and billed under Part B.

"Inpatient hospital services" are defined as the following items and services furnished to an inpatient of a hospital:

>    (1) bed and board;
>    (2) such nursing services and other related services, such use of hospital facilities, and such medical social services as are ordinarily furnished by the hospital for the care and treatment of inpatients, and such drugs, biologicals, supplies, appliances, and equipment, for use in the hospital, as are ordinarily furnished by the hospital for the care and treatment of inpatients; and
>    (3) such other diagnostic or therapeutic items or services, furnished by the hospital…, as are ordinarily furnished to inpatients by such hospital ….

42 U.S.C. § 1395x(b); see also 42 C.F.R. § 409.10(a).  The statute goes on to exclude certain services from Part A coverage, though notably not observation services.  See 42 U.S.C. § 1395x(b)(4), (5).  The statute also defines the term "hospital" specifically to include diagnostic services as part of inpatient services.  42 U.S.C. § 1395x(e)(1) (defining "hospital" in part as an institution "primarily engaged in providing, by or under the supervision of physicians, to inpatients … diagnostic services and therapeutic services for medical diagnosis, treatment, and care of injured, disabled, or sick persons.")

All the services enumerated in 42 U.S.C. § 1395x(b) were furnished to plaintiffs. See Complaint, ¶¶ 56-92.  For example, nurses monitored Richard Bagnall's fluid balance and administered IV medications, and he received an EKG.  For Sarah Mulcahy, a doctor ordered use of an incentive spirometry device to assist with her lung function and compression cuffs to prevent deep vein thrombosis; she also was treated with IV medications for nausea and vomiting.  Besides receiving services such as an MRI and CT scan, both Lawrence Barrows and Florence Coffey had consultations with specialized hospital units. While diagnosis and assessment were certainly components of the services that these beneficiaries received, they were also furnished with a full array of the other

23

items and services listed in §1395x(b), including bed and board and nursing services.

The statute does provide for Part B coverage of "diagnostic services," which are

    (i)     furnished to an individual as an outpatient by a hospital …., and
    (ii)    ordinarily furnished by such hospital … to its outpatients for the
           purpose of diagnostic study.

42 U.S.C. § 1395x(s)(2)(C).  It is significant that this definition does not enumerate the

bed and board, nursing services, social services, and other services included in the

definition of Part A hospital services.  The definition is limited to services furnished to an

outpatient *for the purpose of diagnostic study*.  Thus, it comports with the statute to have

services such as a stand-alone laboratory or diagnostic test be covered under the Part B

diagnostic services benefit.  For example, a patient going to a hospital solely to receive an

MRI as an outpatient is not being furnished with bed and board.  It does not comport with

the statute, however, to classify on observation status hospitalized Medicare patients who

are being furnished the entire panoply of Part A inpatient services as if they were

receiving outpatient diagnostic services under Part B.  It cannot be said that the services

furnished to plaintiffs were limited to "the purpose of diagnostic study," as required by

the Part B outpatient benefit, when they were in fact treated, for dehydration and atrial

fibrillation (Dr. Bagnall), for significantly elevated blood pressure (Mr. Barrows), and for

a urinary tract infection (Ms. Sapp), in addition to receiving bed, board, nursing, and

other hospital services.

Classifying beneficiaries on observation status by using the Part B diagnostic

services benefit unbundles the diagnostic service benefit included in Part A, thus

depriving beneficiaries of the full benefit of Part A coverage to which they are entitled.

For many patients, this also means losing Part A coverage of post-hospital nursing home

care for lack of three days of formal admission as an inpatient, and it also results in the loss of Part A coverage of drugs furnished in the hospital and the loss of *any* hospital coverage for patients who chose not to enroll in Part B, which is voluntary.  Congress could not have intended for the Part A benefit to be circumscribed in such a manner when it created the Part A and B benefits.

The Secretary states that the range of Part A hospital services listed in 42 U.S.C. § 1395x(b) cannot apply to plaintiffs because those services by definition may only be furnished to inpatients, and CMS has defined "inpatient" to mean a person who has been formally admitted as an inpatient.  Def. Mem at 17.[6]  This is a circular analysis.  At least in theory, the decision of formal admission rests with the doctor responsible for the patient's care.  According to the Medicare Benefit Policy Manual (MBPM), CMS Pub. No. 100-02, ch. 1, § 10 (https://www.cms.gov/manuals/Downloads/bp102.c01.pdf), the doctor must make the "complex medical judgment," based on numerous factors, that will determine the services that the doctor believes the patient will require (including nursing services, bed and board, social services, use of appliances, drugs), which in turn leads back to the full range of hospital services listed in § 1395x(b).  The classification of patients on observation status cannot be divorced from the services furnished to the patient.

While the court in *Estate of Landers v. Leavitt*, 545 F.3d 98 (2d Cir. 2008),

---

[6] The definition of "inpatient" in the Medicare Benefit Policy Manual (MBPM) is "a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services. Generally a person is considered an inpatient if formally admitted as inpatient with the expectation that he or she will remain at least overnight and occupy a bed even though it later develops that the patient can be discharged or transferred to another hospital and not actually use a hospital bed overnight."  MBPM, CMS Pub. No. 100-02, ch. 1, § 10.

deferred to the agency's interpretation of the word "inpatient" in the specific context of when to start counting time spent in the hospital for purposes of the three-day rule under 42 U.S.C. § 1395x(i), it did not resolve the issue of how to classify patients as receiving inpatient or outpatient care or whether patients were properly classified as covered under Part A or Part B.[7] *Landers* deferred to the agency's method of calculating time toward the three-day stay requirement in part because that method represented the agency's "consistent and long-held position" on that question.  545 F.3d at 108.  In this case, however, it has only been since the early part of the 2000s or later that observation status has appreciably undercut Part A coverage.  The problem appeared about six or seven years ago when the Secretary began to authorize an increasing number of observation stays that violated the agency's own benchmark of usually no more than 24 hours and occasionally up to 48.  See Complaint, ¶¶ 48-50; MBPM, *supra*, ch. 6, § 20.6.A (Ex. 1 to Def. Mem.).

In the decades before observation status became so heavily used, Medicare patients such as plaintiffs would have received Part A hospital coverage.  They would not have been placed into the twilight zone of Part B hospital outpatient services, where by all appearances and common sense they were inpatients, only to find out later that they were not.  Moreover, the definition of inpatient that *Landers* relies on from the MBPM starts by stating that "[a]n inpatient is a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient services."  Ch.1, § 10.  Once again the definition of inpatient circles back to the services furnished to the patient.

---

[7]   The *Landers* court described its "core holding" as its deference to the agency rule that time spent in the emergency room or on observation status does not count toward the three-day stay requirement.  545 F.3d at 111-112.

In each of the plaintiffs' cases, a doctor decided that the patient was sick enough to stay in the hospital for at least three days to receive a range of hospital services. They could not go home, nor could they be sent to a lower level of care.  Plaintiffs cannot be viewed as receiving services limited to the purpose of diagnostic study, as is required by the Part B outpatient benefit.  But, rather than following the statutory definition of Part A versus Part B hospital services, or even the decisions of the doctors who are actually attending to and treating the patients, the Secretary has effectively delegated the authority to classify patients as inpatient or observation status to the private owners of proprietary, commercial guidelines.  See Complaint, ¶ 40.  When these guidelines determine that a beneficiary is an observation status outpatient despite receiving the full range of Part A hospital services, the Medicare statute is violated and the beneficiary loses the coverage to which she is entitled under Part A.

### B.      Causes II and III are valid because the rulemaking provisions require notice and comment.

The Secretary contends that the challenged policy is interpretive and therefore not subject to notice and comment under the rulemaking provisions of either the Administrative Procedure Act (APA), 5 U.S.C. § 553, or the Medicare statute, 42 U.S.C. § 1395hh(a)(2).  Def. Mem. at 19-20.[8]  Medicare manual provisions, however, are legislative when they operate to deny coverage that would otherwise be available.  In *Linoz v. Heckler*, 800 F.2d 871, 877-878 (9th Cir. 1986), the Ninth Circuit considered a Carriers Manual exception to the general rule allowing coverage for ambulance services.

---

[8]  The contention that the policy at issue is unclear (Def. Mem. at 19) is a pretense. As the Complaint makes clear, the issue is the Secretary's policy of using the classification of Medicare beneficiaries on observation status, which is a billing mechanism, to deprive them of Part A coverage. See, *e.g.,* Complaint, ¶¶ 1, 4.

The court held that it was legislative and was therefore invalid because it had not been promulgated pursuant to § 553's notice-and-comment requirements.  See also, *e.g., Cedars-Sinai Medical Center v. Shalala*, 939 F.Supp. 1457, 1465 (C.D.Cal. 1996) (striking down another Medicare manual provision because it changed the policy); *accord*, *Sweet v. Sheehan*, 235 F.3d 80, 91 (2d Cir. 2000) (Second Circuit notes with approval the D.C. Circuit's view that, when "the rule effectively amends a prior legislative rule," it is itself legislative).

     The rule prior to the Secretary's embracing of observation status as a means to limit Medicare hospital coverage to Part B was that beneficiaries receiving a hospital level of care in a hospital were covered under Part A.  That rule has now been effectively undercut.  All the named plaintiffs stayed at least several nights in the hospital and alleged that they received a hospital level of care, including a range of hospital services, but all of them were deprived of Part A coverage by the expedient of classifying them on observation status.  That is a change in the general rule, which renders it legislative and therefore subject to rulemaking under § 553.

     Furthermore, even an interpretive rule, if it represents a change in position, requires APA rulemaking.  *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 100 (1995) (interpretive rule in Medicare manual provision would require APA rulemaking if it "adopted a new position inconsistent with any of the Secretary's existing regulations"); *Alaska Professional Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C.Cir. 1999) (agency's revising of interpretive rule is a de facto amending of rule and therefore requires notice and comment); *Children's Hosp. of Buffalo v. Apfel*, 110 F. Supp. 2d 158, 165 (W.D.N.Y. 2000), aff'd, 2 Fed.Appx. 141 (2d Cir. 2001).  The Secretary's policy

allowing patients' hospital stays to be considered outpatient is a change in position that

undermines the previous policy of recognizing Part A coverage for hospitalized Medicare

beneficiaries.

Moreover, the Secretary assumes that the APA standard applicable to notice-and-

comment rulemaking is the same as that in the Medicare provision.  Def. Mem. at 19.

That assumption is incorrect.  The language of 42 U.S.C. § 1395hh(a)(2) is broader than

5 U.S.C. § 553(b), as it

> explicitly forb[ids] the Secretary from promulgating any "rule,
> requirement, or other statement of policy ... that establishes or changes a
> substantive legal standard governing the scope of benefits, the payment for
> services, or the eligibility of individuals, entities or organizations to
> furnish or receive benefits under this subchapter ... unless it is
> promulgated by the Secretary" through notice-and-comment rulemaking.

*Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 75 (2d Cir. 2006).  The Second Circuit

explained that § 1395hh(a)(2) was added after the Secretary's change of a Medicare

manual provision displeased Congress:

> This reframing of settled law under the Administrative Procedure Act ...
> can be read as a congressional shot across the bow: The House Budget
> Committee noted its concern that "important policies are being developed
> without benefit of the public notice and comment period and, with
> growing frequency, are being transmitted, if at all, through manual
> instructions and other informal means."

*Id*. (citation omitted).

Although the Second Circuit ultimately did not rule on the breadth of §

1395hh(a)(2), its discussion of the circumstances in which that statute was passed

demonstrates that it was intended to encompass situations beyond those covered by the

APA provision.  It would have been illogical for Congress to add to the Medicare statute

a requirement that already was applicable to Medicare via the APA.  This situation, in

which coverage of hospitalization was shifted from Part A to Part B, fits precisely within that purpose and congressional intent.  The Secretary's shift to Part B coverage for hospitalized beneficiaries satisfies the terms of § 1395hh(a)(2) and therefore is invalid unless the provision's notice-and-comment requirement is met.[9]

The Secretary's policy employs the fictional concept of observation status increasingly to replace Part A hospital coverage with Part B coverage.  This is not an interpretation of the statute but a repudiation of the general coverage rule.  The APA prohibits such changes in coverage without notice-and-comment rulemaking. Furthermore, Medicare's rulemaking provision requires notice and comment before the Secretary may establish a requirement that alters beneficiaries' eligibility, which is precisely the impact of using observation status to replace Part A coverage with Part B.

C.   **Cause IV is valid because the policy was not published in the Federal Register.**

The Secretary seeks dismissal of plaintiffs' fourth claim, which requires publication in the Federal Register of both substantive rules and "interpretations of general applicability," 5 U.S.C. § 552(a)(1)(D), on the ground that publication is not required under this provision or that the Secretary has met the publication requirement.

First, publication is required in this situation.  The Second Circuit requires publication for "matters which if not published would adversely affect a member of the

_____

[9]  That the Secretary has made observations about observation status in the Federal Register (see Def. Mem. at 21) does not resolve the issue.  Those entries are discussions of observation status, not a proposal to establish a policy that addresses the question of Part B coverage of observation services.  See, *e.g.*, 65 Fed.Reg. 18434, 18448 (Apr. 7, 2000) (observation "services have been used so inappropriately in the past that we will have to gather data"); 63 Fed.Reg. 47552, 47570 (Sept. 8, 1998) ("[T]he distinction between inpatient and outpatient care has been blurred by the retention of outpatients in the hospital overnight ….")  The Secretary has never proposed a rule that would create and define observation status as a Part B covered service.

public." *State of New York v. Lyng*, 829 F.2d 346, 354 (2d Cir. 1987) (citations and internal quotation marks omitted). The Secretary argues that not one member of the public is affected by the failure to publish because publication would not cause anyone to alter her behavior. Def. Mem. at 22-23.

This argument errs in two respects. First, many beneficiaries *would* alter their behavior if informed that classification on observation status deprives them of Part A coverage. For instance, they, their family, or an advocate could try to convince the doctor and hospital to formally admit them, or they could leave and go to another hospital. They might also alter their financial planning and might choose a different Medicare or Medigap insurance option. Certainly the facts of the named plaintiffs' situations demonstrate that, without knowledge of the significance of observation status, they were largely without recourse.

But the argument fails for a second reason. Whether behavior can be altered is not the standard; the standard is whether a member of the public will be adversely affected. The Second Circuit specifically adopted that standard "because it comports with the stated purpose of providing guidance to the public." *State of New York*, 829 F.2d at 354; see also, *e.g., Chen v. Slattery*, 862 F.Supp. 814, 822 (E.D.N.Y. 1994) ("The publication requirement … is intended to prevent an agency from enforcement of a rule without notice"). As the Ninth Circuit noted in its alternative ruling in *Linoz*, 800 F.2d at 878 n. 11, the rule at issue violated § 552(a)(1)(D) because "it had a significant impact on a segment of the public …." There was no suggestion that a member of that segment had to demonstrate how she would have responded if there had been notification.

It is obvious that the failure to publish the policy of depriving beneficiaries of Part

A coverage adversely affects them.  They enter and stay in hospitals without knowing that they are not covered under Part A, with all the attendant ramifications.  It is shocking for them and their families to discover after the fact that their classification on observation status has not only cost them financially in the hospital but also will cause a deprivation of SNF coverage.  There can be no doubt that a member of the public is adversely affected by the failure to meet the publication requirement.[10]

The Secretary's alternative theory is that the Secretary did publish in the Federal Register.  The publication to which she refers, however, is merely a statement "that observation services are outpatient services."  Def. Mem. at 22.  She fails to recognize that the policy at issue is the use of observation status to replace Part A coverage with Part B coverage.  See *supra* at 27 n. 8.  That policy needs publication because that information will inform beneficiaries and their families of the crucial impact of observation status.  Since a hospital level of care is supposed to result in Part A coverage, and since the care provided on observation status usually is a hospital level of care, beneficiaries naturally assume that they are covered under Part A, with the generally favorable consequences that flow from that coverage.  The Secretary's policy deviates from that position, however, and the information is needed "for the guidance of the public."  5 U.S.C. § 552(a)(1).

Section 552(a)(1)(D) requires publication in the Federal Register of substantive rules and "interpretations of general applicability" that adversely affect one member of the public.  The Secretary's use of observation status to deprive Medicare beneficiaries of

---

[10]  The Secretary's reliance on other sources of alleged information, Def. Mem. at 23 n. 9, is misplaced.  Congress directed the Secretary to publish the policy in the Federal Register.  It is an explicit directive that offers no alternatives.

Part A coverage meets that standard.  The failure to publish requires its invalidation.

> **D.      Cause V is valid because the deprivation of plaintiffs'
> Part A coverage by classifying them on observation status was
> arbitrary and capricious under the APA.**

Under 5 U.S.C. § 706(2)(A), an agency's action "may be set aside if found to be

'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,

463 U.S. 29, 41 (1983).  "Review under this provision is narrow, limited to examining the

administrative record to determine whether the [agency] decision was based on a

consideration of the relevant factors and whether there has been a clear error of

judgment."  *Riverkeeper, Inc. v. U.S. Environmental Protection Agency*, 358 F.3d 174,

184 (2d Cir. 2004) (citations and internal quotation marks omitted; brackets in original).

> Normally, we must deem arbitrary and capricious an agency rule where
> the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the evidence
> before the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

*Waterkeeper Alliance, Inc. v. U.S. Environmental Protection Agency*, 399 F.3d 486, 498

(2d Cir. 2005) (citation and internal quotation marks omitted); see also, *e.g., Forest

Watch v. U.S. Forest Service*, 410 F.3d 115, 118-119 (2d Cir. 2005).  The D.C. Circuit

has summarized a court's role for this review: "'[A]rbitrary and capricious' review

focuses on the reasonableness of an agency's decisionmaking processes."  *Rural Cellular

Ass'n v. Federal Communications Comm'n*, 588 F.3d 1095, 1105 (D.C.Cir. 2009).

In this instance, the Secretary has failed in almost every respect.  First, the

concept is irrational on its face: hospitalized patients spend days or weeks receiving

hospital services, only to be informed that they were not hospitalized and not covered by

the Part A hospital benefit.  Second, the ramifications of that action run directly contrary to a major goal that Congress sought to achieve with that benefit: coverage for follow-up SNF care of "hospitalized" beneficiaries that would be less expensive, free up a hospital bed, and provide the final phase of care necessary to restore the patient's health.  S. Rep. No. 89-404, *supra*, reprinted in [1965] U.S.C.C.A.N. at 1971; see also 70 Fed.Reg. 29070, 29098-29099 (May 19, 2005).

Third, the Secretary has allowed observation status, which did not exist when Medicare was created and when the distinction between inpatient and outpatient was clearly delineated, to become a significant factor in the hospitalization process for Medicare beneficiaries, without meaningfully responding to the impact of that event and to its importance in Part A coverage.  More observation status claims are filed every year, and the length of time that people spend on observation status is also increasing, so that about one out of eight observation stays is for more than two days.  See *supra* at 3.  The effect of those developments is enhanced by the fact that the average length of stay in hospitals has dramatically declined since Medicare's creation almost fifty years ago.  The overall impact is to greatly decrease the chances that a hospitalized Medicare patient will be eligible for the follow-up SNF coverage.  Even the Secretary has recognized that the effect of classifying beneficiaries on observation status may subvert congressional intent, 70 Fed.Reg. at 29099, but, over six years ago, the Secretary was "not yet ready to make a final determination at this time" about the impact of observation status, 70 Fed.Reg. 45026, 45050 (Aug. 4, 2005) – and still has taken no action.

With no statutory authority, the Secretary has embraced a policy that did not exist when Medicare began, that is counterintuitive and irrational on its face, that was designed

as a billing mechanism but operates to deprive beneficiaries of Part A coverage, that is increasingly depriving patients of that coverage, and that the Secretary has never formally addressed despite considerable expressions of doubt about the validity of the policy and its negation of congressional intent.  It is arbitrary and capricious within the meaning of the APA.

The Secretary alternatively contends that APA review is not available because plaintiffs have failed to challenge a discrete action.  Def. Mem. at 23-24.  That is incorrect, for two reasons.  First, merely because the Secretary has not formally issued a regulation does not undercut the fact that she has condoned the application of observation status.  She has acknowledged in the Medicare Manuals and the Federal Register that observation status is part of the Medicare program, and plaintiffs have alleged that the number of patients who are classified on observation status is increasing and that, as a consequence, hundreds of thousands of Medicare beneficiaries are deprived of Part A coverage annually.  The rule exists, and it is being applied with devastating results.

Second, the individual plaintiffs' situations present final agency action, in that they were hospitalized, received a hospital level of care, were classified on observation status, and were denied Part A coverage for hospital and subsequent SNF care.  Those events demonstrate discrete, final agency action.  This was not an abstract policy choice, but a rule applied to plaintiffs that deprived them of coverage to which they were entitled.

### E.  Causes VI and VII are valid because existing notice and appeal practices for beneficiaries classified on observation status do not comport with the statute or due process.

The Secretary claims that plaintiffs receive sufficient notice regarding their observation status through the Medicare Summary Notice (MSN) and that they have

requested an "unrealistic" pre-deprivation notice.  Def. Mem. at 26.  The MSN, however, is delayed and unclear, and does not provide reliable notice of the determination that a beneficiary is on observation status.  The Secretary also claims that plaintiffs already have a right to appeal through the regular administrative review process for Part B claims, but this is belied by the experiences of the individual plaintiffs.  Far from being an "impossible obstacle," *id*., timely written notice with an expedited appeal system is already required in several analogous contexts, including for hospital inpatients.  Both the statute and the Due Process Clause require additional procedural protections for hospitalized Medicare patients classified on observation status.

1.      The statute requires understandable and timely notice.

There is a statutory mandate to provide notice of the agency's initial determinations of whether an individual is entitled to benefits under Part A or Part B.  42 U.S.C. § 1395ff.  The Secretary defines an "initial determination," *inter alia*, as any issue "having a present or potential effect on the amount of benefits paid under Part A or Part B."  42 C.F.R. § 405.924(b)(11).  There can be no question that the classification of a beneficiary on observation status is an initial determination under this definition, for the classification affects the amount of benefits paid under both Part A and Part B.  The statute and regulations provide deadlines for sending notice of initial determination and provide generally for appeal rights.  42 U.S.C. § 1395ff(a), (b); 42 C.F.R. § 405.900 *et seq*.  This process results in the mailing of MSNs, but they arrive several months after services are provided and are the gateway into the administrative review system only for services that have already been provided.

The statute requires notices of initial determinations to be "written in a manner

calculated to be understood by the individual entitled to benefits under part A…or

enrolled under part B…or both." 42 U.S.C. § 1395ff(a)(4)(B). It must include "the

reasons for the determination." *Id*., § 1395ff(a)(4)(A); see also 42 C.F.R. §

405.921(a)(2). Yet the MSNs listing hospital services received by beneficiaries who

were on observation status usually do not contain the words "observation status" or

"observation services." They simply list the hospital claims as covered Part B outpatient

claims. They do not explain why the hospital claims are outpatient claims. There is no

explanation of the causal link between these Part B covered services and the denial of

Part A post-hospital SNF coverage that beneficiaries are also probably facing. See Ex. 3

to Def. Mem. (doc. # 24-3).

Medicare beneficiaries are left to realize on their own that they should attempt to

challenge covered hospital services in order to challenge an uncovered nursing home

stay, or to determine that the drugs they received at the hospital were not covered. While

the MSN does inform beneficiaries that they can "circle the items [they] disagree with"

for an appeal, Def. Mem. at 25, it is counterintuitive and could appear risky to a

beneficiary to indicate that she disagrees with hospital claims that have been covered.

The statute also mandates expedited determinations for beneficiaries who are

facing discharge from a provider of services or termination of services where there is a

health risk. 42 U.S.C. § 1395ff(b)(1)(F)(i). The Secretary has interpreted the term

"discharge" in the hospital context to apply not only to a physical discharge from the

hospital but also "when a beneficiary is discharged 'on paper'—meaning that the

beneficiary remains in the hospital, but at a lower level of care (for example, the

beneficiary is moved to a swing bed or to custodial care)." Medicare Claims Processing

Manual, *supra*, ch. 30, § 200.1.

Nevertheless, the regulations and manual provisions implementing and interpreting the mandate for expedited determinations specifically carve out beneficiaries on observation status from receiving notice of their rights.  The "Important Message from Medicare," a form that must be provided to Medicare beneficiaries in a hospital "at or near admission," 42 C.F.R. § 405.1205(b)(1), must describe "the beneficiary's rights *as a hospital inpatient*, including the right to benefits … for post-hospital services."  *Id*., § 405.1205(b)(2)(i) (emphasis added).  The Manual, ch. 30, § 200.1, only allows for pre-deprivation notice and expedited determinations when the beneficiary is considered an inpatient.  These provisions prevent beneficiaries on observation status from learning about their rights, including potential coverage or non-coverage of post-hospital services.

While beneficiaries who are initially classified on observation status are specifically excluded from notice by the regulations and Manual, beneficiaries whose status is changed from inpatient to observation have more protection.  42 C.F.R. § 405.1206(a) states that a beneficiary has a right to an expedited determination when a hospital "determines that inpatient care is no longer necessary."  This comports with the regulation mandating that URCs provide notice when they determine that admission to or continued stay in the hospital is no longer necessary, which has apparently been interpreted to require notice when inpatient status is changed to observation status.  *Id*., § 482.30(d)(3); Medicare Claims Processing Manual, ch. 30, § 200.2.

Plaintiffs have alleged that in practice this notice usually does not issue (Complaint, ¶ 44), but, even if it does in some instances, there is no principled reason for the differing treatment of those who are classified on observation status from the

beginning and those whose status is changed from inpatient to observation during their hospital stay.  The consequences for beneficiaries in both situations are identical.

2.     The statute requires an expedited appeal procedure.

Expedited proceedings are required by 42 U.S.C. § 1395ff(b)(1)(F). Regulations implement this requirement for home health agencies, SNFs, comprehensive rehabilitation facilities, and hospitals.  See 42 C.F.R. §§ 405.1200-.1206.  Hospitals must provide a notice of non-coverage no later than two days before termination of services, and, if the beneficiary contacts the Medicare contractor by midnight of the day of discharge, he will receive a response by one calendar day after the contractor receives requested information.  Medicare Claims Processing Manual, ch. 30, § 200.4.  But, as noted above, the Secretary has interpreted these requirements to apply only to beneficiaries who are considered hospital inpatients covered under Part A.

The Secretary asserts that plaintiffs currently have administrative review rights as they normally exist for Part B claims.  This refers to the opportunity to disagree with and appeal claims that are listed on the MSN.  Def. Mem. at 27. This process operates after the fact, though, and is of no use for beneficiaries who had to forgo needed SNF care.  Hospitalized beneficiaries must be able to appeal before they face the ramifications of being classified on observation status.

In addition, plaintiffs' experiences in trying to avail themselves of the existing system of appeals for Part B claims contradict the Secretary's claim that her current policy provides effective administrative review.  The two named plaintiffs who did not have experienced Medicare attorneys representing them in the administrative process

(Denise Rugman for Florence Coffey and Shirley Burton for Nettie Jean Sapp) found themselves in a morass of confusing information from Medicare when they attempted to challenge the observation status classification.  See Complaint, ¶¶ 83-95.  Ms. Rugman began her attempts to challenge the classification of her mother in June 2010, and now, more than a year and a half later, she has been told that she cannot appeal hospital claims that were covered by Part B and that she should appeal the nursing home claims, which she tried to do initially.  *Id.*, ¶ 95.  Ms. Burton's efforts to obtain Part A coverage of her sister's hospital stay have been marked by letters that received no response and assertions that Medicare does not even have the hospitals' claims in its system.  *Id.*, ¶ 88.  These plaintiffs were repeatedly frustrated in their attempts to appeal the observation status classification and subsequent SNF denial.

Even those plaintiffs who had assistance from attorneys experienced in Medicare advocacy have received highly inconsistent results about threshold matters, including jurisdiction and meeting the amount-in-controversy requirement.  An ALJ held that Richard Bagnall could not challenge his classification because there was no amount in controversy in the appeal of his hospital claims.  Notice of Administrative Decisions (doc. # 22-2).  This decision ignored the $5,685 that Dr. Bagnall had to pay for SNF care as a result of the classification of his hospital claims, Complaint, ¶ 59, and strongly suggests that beneficiaries in this situation have no remedy to challenge a determination that has cost them money and/or needed medical care.  In the decision on Charles Renshaw's appeal, the ALJ stated that ALJs lack the jurisdiction to alter "the billing of services" or to require the provider to do so, again leaving the beneficiary without a remedy.  Notice of Administrative Decision (doc. # 31-1 at 2).

Oddly, though, in Lee Barrows' case on behalf of her husband, the Medicare Appeals Council (MAC) did not question whether it had jurisdiction to make alterations in the observation status classification, or whether the amount-in-controversy threshold was met.  Notice of Administrative Decisions (doc. # 22-1).  The MAC found that Lawrence Barrows had indeed been misclassified on observation status and ordered appropriate adjustments in payment.  It applied a 24-hour benchmark, whereby a patient who is generally expected to require a hospital level of care for more than 24 hours should be admitted as an inpatient.  *Id.* at 6-7.  These inconsistent decisions regarding jurisdiction and the availability of a remedy demonstrate that the Secretary lacks a policy for addressing challenges to observation status.

3.     <u>The Secretary violates due process by failing to provide adequate notice and appeal rights to beneficiaries who have been classified on observation status.</u>

The Secretary claims that additional notice and appeal safeguards are not required by the Due Process Clause, but the basic procedural unfairness inherent in the current treatment of observation status beneficiaries is apparent.  Throughout the history of the Medicare program, courts have consistently held that due process requires that beneficiaries be given a clear written notice when medical services are denied.  See, *e.g*., *Kraemer v. Heckler*, 737 F.2d 214, 222 (2d Cir. 1984); *Gray Panthers v. Schweiker*, 652 F.2d 146, 168-169 (D.C. Cir. 1980); *Grijalva v. Shalala*, 946 F.Supp. 747, 755 (D. Ariz. 1996), aff'd, 152 F.3d 1115, 1121 (9th Cir. 1998), vacated, 526 U.S. 1096 (1999); *Vorster v. Bowen*, 709 F. Supp. 934, 946 (C.D. Cal. 1989); *David v. Heckler*, 591 F.Supp. 1033, 1043-44 (E.D.N.Y. 1984).  Furthermore, the right to administrative review must also be timely.  *Kraemer*, 737 F.2d at 222; see also *Grijalva*, 946 F.Supp. at 759 ("The existing

system fails to provide a 'meaningful opportunity' to present the claim 'at a meaningful time.' Subsequent due process, available in the administrative review phase of the appeal, comes too late in many cases").

The Secretary lists three reasons why a beneficiary classified on observation status suffers no deprivation triggering due process protections: 1) The government has not made a decision on the claim for benefits because it has not yet received a claim for benefits; 2) coverage for observation status claims is available under Part B; and 3) the Part B claims will be listed on an MSN which carries administrative appeal rights. Def. Mem. at 26, 27 n.12.

The first rationale begs the question because, if the Secretary provided the timely notice and review required by the statute and due process, she *would* be making a decision on the claim for benefits. It is the inability to obtain an initial determination until the MSN arrives that causes the due process violation. The second reason ignores the fact that, when beneficiaries are classified on observation status under Part B, they are denied the full range of Part A coverage to which they are entitled. They lose Part A coverage of the drugs that they receive while in the hospital, protection against the Part B copayment requirements for individual services furnished at the hospital, and the coverage of post-hospital SNF care that is so commonly needed by Medicare beneficiaries. Furthermore, for those who have opted not to enroll in Part B, classification on observation status amounts to a complete denial of coverage. The third reason is unavailing because the after-the-fact and unclear MSN is deficient for the reasons explained above.

In line with the inherent flexibility of due process, *Mathews v. Eldridge,* 424 U.S.

319 (1976), sets out a three-factor balancing test to analyze the propriety of additional

procedures designed to protect beneficiaries' rights.  See also *Furlong v. Shalala*, 238

F.3d 227, 236 (2d Cir. 2001); *Kraemer*, 737 F.2d at 221-222.  Courts must balance

> the private interest that will be affected by the official action; …the
> risk of an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and … the Government's interest,
> including the function involved and the fiscal and administrative
> burdens that the additional or substitute procedural requirement
> would entail.

*Eldridge*, 424 U.S. at 335.[11]

    The private interest: The Medicare program is relied on by elderly and disabled

beneficiaries to protect them from the costs of health care.  Part A coverage is an integral

component of that program; it covers some of the most expensive elements of medical

care, hospitalization and care in a skilled nursing facility (SNF).  Beneficiaries on

observation status in a hospital often enter through the emergency department after a

traumatic event such as a fall (like Mildred Savage and Charles Renshaw), and they often

have serious pre-existing medical problems (like Florence Coffey's muscular dystrophy

and metastatic breast cancer).  Their fragile and compromised health status renders them

particularly vulnerable and reliant on the Medicare program to cover them for the care

that they need, which is likely to include post-hospital SNF care.  Consequently, a

significant private interest is clearly at stake when Part A coverage of a hospital stay is

denied to a beneficiary on observation status, even if Part B coverage is provided.

    In *Kraemer*, the issue was the right to pre-deprivation notice and hearing for

---

[11] The third factor is more properly viewed as encompassing the "public interest," not
just the government's: "In striking the appropriate due process balance the final factor to
be assessed is the public interest."  *Eldridge*, 424 U.S. at 347.

Medicare beneficiaries in hospitals and nursing homes whose Medicare coverage was

being terminated by a URC.  Recognizing that the loss of health care coverage was

extraordinary, the Second Circuit emphasized the distinction between that loss and the

denial of Social Security eligibility at issue in *Eldridge*:

> [T]he private interest at stake should be weighed more heavily than
> in *Eldridge* because of the astronomical nature of medical costs ….
> In this case, the costs that accrue in the period between an
> unfavorable URC decision and an "initial determination" by the
> Secretary – which appellants argue is approximately three weeks
> – can financially cripple all but the very wealthy.

737 F.2d at 222; see also, *e.g., Grijalva*, 152 F.3d at 1121.  In this situation, since

it can be several months before a beneficiary receives an initial determination in

the form of an MSN, the loss of SNF coverage without administrative review is

considerably more egregious.

In *Grijalva*, the Court of Appeals also noted that, even if some denials could be

remedied by later reimbursement, "the *potential* for irreparable damage is surely great

when it comes to denial of medical services (particularly denial without notice of any

reason for the denial)."  *Id.* at 1122 (emphasis added).  The potential for irreparable

damage is significant in this case as well.

Given the nature of the private interest involved, this factor weighs heavily in

favor of additional procedural protections.

Risk of erroneous deprivation:  When the ability to obtain coverage of, or even

access to, post-hospital extended care, hinges on a counterintuitive determination of

status based on proprietary guidelines, the risk of erroneous deprivation is great.  In

current practice, notice is generally non-existent at the point in time when it could have

any effective meaning.  There is no notice given to patients initially classified on

observation status, and while there may be a requirement for notice to be given when a beneficiary is changed from inpatient to observations status, plaintiffs allege that this often does not happen.  Richard Bagnall, for example, did not receive any written notice that his status had been retroactively changed although he was initially admitted as an inpatient.  Complaint, ¶¶ 56-60.  When a beneficiary is unaware that a determination regarding his status has been made, the possibility of a mistaken deprivation greatly increases.  This is particularly true when, by commonsense standards, the beneficiary is hospitalized, *seems* to be an inpatient, and would have no reason to question his status.

The risk of erroneous deprivation is magnified by the use of proprietary guidelines to determine the beneficiary's classification.  See Complaint, ¶ 40.  Even if timely notice of the classification itself were provided, it is difficult to see how a beneficiary could mount a meaningful challenge to his classification when the guidelines used to determine his status are proprietary and not made available to beneficiaries even for purposes of appeal.  See *Gray Panthers*, 652 F.2d at 168-169 ("[w]ithout notice of the specific reasons for denial, a claimant is reduced to guessing what evidence can or should be submitted in response"); *Grijalva*, 152 F.3d at 1122 ("The appeal rights and other procedural protections available to Medicare beneficiaries are meaningless if the beneficiaries are unaware of the reason for service denial and therefore cannot argue against the denial.").

This second factor also weighs in favor of greater procedural protections for beneficiaries, such as plaintiffs, who are classified on observation status.

The public interest:  The burden of requiring pre-deprivation notice and appeal rights would be minimal.  The Medicare program has considerable expertise in requiring

providers to issue pre-deprivation notices.  It already requires many providers, including

hospitals, to provide an Advance Beneficiary Notice (ABN) when they determine that the

services to be provided are not medically necessary.  42 U.S.C. § 1395pp(a).  This notice

allows beneficiaries to make an informed choice about accepting financial liability and

whether they want to appeal.  Chapter 30 of the Medicare Claims Processing Manual is

devoted to the detailed requirements for the numerous ABNs used by home health

agencies, SNFs, and hospitals, as well as the expedited review notices that hospitals,

hospices, home health agencies, and comprehensive outpatient rehabilitation facilities

must use when beneficiaries have a right to expedited review.

     The Secretary already specifically requires hospitals to deliver the "Important

Message from Medicare" to beneficiaries considered inpatients.  42 C.F.R. §

405.1205(b).  The relief sought by plaintiffs would require providing a similar notice.

For example, beneficiaries who do not receive the "Important Message from Medicare"

because they are classified on observation status could be provided a notice that informs

them that they have been so classified, lists the ramifications of that classification, and

provides the right to appeal.  The administrative burden of requiring Medicare to provide

a notice similar to the notices provided in analogous contexts would not be great.

Providing an expedited review would also not be unduly burdensome, as there already

exists an expedited appeal system established for beneficiaries in hospitals, 42 C.F.R. §

405.1206, which could also be used for review of whether a hospitalized Medicare

patient has been properly classified on observation status.

     In sum, most beneficiaries classified on observation status do not receive adequate

or timely notice, and those who attempt to challenge their classification can only do so

when they have probably already had to forgo needed care in a SNF.  Although they face

the same risks as other beneficiaries who are afforded pre-deprivation review, they

cannot make use of the expedited appeal process for hospital patients.  They cannot make

meaningful use of the administrative review system for Part B claims because the

opportunity arrives too late and the MSN does not provide adequate notice.  Even those

who manage to enter the review system are often frustrated by barriers that deprive them

of access to a remedy.

　　　　The appeal winds up falling between the cracks of Part A and Part B, which

illustrates the ambiguity and irrationality of the concept of observation status.  Because

beneficiaries classified on observation status are receiving Part A benefits masquerading

as Part B coverage, Medicare has no clear method for addressing notice and appeal rights.

This produces the odd and inconsistent results experienced by plaintiffs when they

attempted to challenge their classifications.

　　　　**F.**　　**Causes VIII and IX are valid because the practice of classifying Medicare beneficiaries on observation status interferes with the practice of medicine.**

　　　　Plaintiffs' last two causes of action allege that two aspects of the Secretary's

policy on observation status violate the Medicare statute's prohibition against

interference with the practice of medicine, 42 U.S.C. § 1395:

> Nothing in this subchapter shall be construed to authorize any Federal officer
> or employee to exercise any supervision or control over the practice of
> medicine or the manner in which medical services are provided, or over the
> selection, tenure, or compensation of any officer or employee of any
> institution, agency, or person providing health services; or to exercise any
> supervision or control over the administration or operation of any such
> institution, agency, or person.

Plaintiffs' experience with observation status reflects exactly the kind of interference that

47

is prohibited.  The Secretary's use of observation status exercises "supervision or control" over the practice of medicine and over the "administration and operation" of physicians and hospitals.

First, while the Secretary takes the position that physicians make the decision to classify Medicare beneficiaries on observation status, the reality is that this decision is effectively made by the hospitals and is driven by the Secretary's policies.  Among the most important of those driving factors is that Recovery Audit Contractors (RACs), who are contracted by the Secretary, review admission decisions and can reverse them.  See 42 U.S.C. § 1395ddd.  If a decision to admit is reversed, the hospital not only does not receive payment for Part A coverage but cannot rebill under Part B.  Consequently, hospitals have a decided incentive to classify Medicare-covered patients on observation status in order to ensure that the hospitals will at least receive a Part B payment.

Rendering this process even more removed from the doctor-patient relationship is that the RACs rely on proprietary screening tools developed and owned by private companies (such as the McKesson Corporation's "InterQual") that are generally unknown and unavailable to the public and that do not make appropriate individualized assessments of patients.  Knowing that the RACs will be relying on these standards to review their admissions, hospitals now generally use the same proprietary tools to make their admission and observation status decisions.  See Complaint, ¶ 40.

Consequently, the Secretary motivates hospitals to direct physicians to classify Medicare beneficiaries on observation status.  The effect is to deprive beneficiaries of the hospital benefit's SNF coverage, which forces them to pay the exorbitant costs of nursing home care, or, as is the case for many beneficiaries, to return home without adequate

follow-up care because they are unable to pay, with all the attendant risks.  Complaint, ¶ 53.  The classification on observation status leads inexorably to the denial of care and thus runs afoul of the requirement that the government not "direct or prohibit any kind of treatment or diagnosis."  *Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989).

The Secretary is thus exercising "supervision or control over the practice of medicine or the manner in which medical services are provided" and "over the administration or operation" of the hospital and the physician.

For similar reasons, allowing a hospital's Utilization Review Committee (URC) to reverse the physician's decision to admit, thus retroactively classifying beneficiaries on observation status, violates the anti-interference provision.[12]  When the URC takes that action, it is acting pursuant to the same motivations and incentives that direct hospitals to classify Medicare beneficiaries on observation status in the first place.  If a doctor has managed to have her patient admitted, she should not be subject to reversal by a hospital bureaucracy that is primarily concerned with protecting the hospital's fiscal situation.  Again, the hospital's motivation to classify Medicare beneficiaries on observation status derives directly from the Secretary's policies and operates to interfere with the practice of medicine and the physician's provision of services.

**CONCLUSION**

For the reasons stated, the Motion to Dismiss should be denied.

---

[12]  Only two members of a URC must be medical doctors.  See 42 C.F.R. §§ 482.30(b), 482.12(c)(1).

DATED: Feb. 21, 2012

Respectfully submitted,

*/s/ Gill Deford*

KEVIN PRINDIVILLE
*pro hac vice*
ANNA RICH
*pro hac vice*
National Senior Citizens Law Center
1330 Broadway, Suite 525
Oakland, CA  94612
(510) 663-1055
Fax (510) 663-1051
kprindiville@nsclc.org
arich@nsclc.org

ERIC CARLSON
*pro hac vice*
National Senior Citizens Law Center
3701 Wilshire Blvd., Suite 750
Los Angeles, CA 90010
(213) 674-2813
Fax (213) 368-0774
ecarlson@nsclc.org

GILL DEFORD
Federal Bar No. ct19269
JUDITH A. STEIN
Federal Bar No. ct08654
ALICE BERS
Federal Bar No. ct28749
MARY T. BERTHELOT
Federal Bar No. ct23679
Center for Medicare Advocacy, Inc.
P.O. Box 350
Willimantic, CT 06226
(860) 456-7790
Fax (860) 456-2615
gdeford@medicareadvocacy.org
jstein@medicareadvocacy.org
abers@medicareadvocacy.org
tberthel@medicareadvocacy.org

TOBY S. EDELMAN
*pro hac vice*
Center for Medicare Advocacy, Inc.
1025 Connecticut Ave., N.W.,
Suite 709
Washington, D.C. 20036
(202) 293-5760
Fax (202) 293-5764
tedelman@medicareadvocacy.org

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

        This is to certify that, on Feb. 21, 2012, a copy of the foregoing Memorandum in Opposition to Defendant's Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


                                                        */s/ Gill Deford*
                                                        GILL DEFORD
                                                        Center for Medicare Advocacy