```
 1    UNITED STATES DISTRICT COURT

 2    DISTRICT OF CONNECTICUT

 3
      RICHARD BAGNALL, et al,      )
 4                 Plaintiff,      )         NO: 3:11CV1703(MPS)
                                  )
 5    vs.                         )
                                  )              May 3, 2013
 6    KATHLEEN SEBELIUS,          )
      Secretary of Health and     )
 7    Human Services,             )
                   Defendants.    )         ORAL ARGUMENT
 8    _____

 9                        450 Main Street
                        Hartford, Connecticut
10

11    B E F O R E:
              THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
12

13    A P P E A R A N C E S:

14    For the Plaintiff :         ALICE BERS, ESQUIRE
                                  GILL W. DEFORD, ESQUIRE
15                                Center for Medicare Advocacy
                                  P.O. Box 350
16                                Willimantic, CT 06226

17
      For the Defendant:          JOEL L. McELVAIN, ESQUIRE
18                                U.S. Department of Justice
                                  Federal Programs Branch
19                                Civil Division
                                  20 Massachusetts Ave., NW
20                                Washington, DC 20001

21                                CAROLYN AIKO IKARI, AUSA
                                  U.S. Attorney's Office
22                                450 Main Street
                                  Hardford, CT 06103
23

24    Court Reporter:            Martha C. Marshall, RMR, CRR

25    Proceedings recorded by mechanical stenography, transcript
      produced by computer.
```

```
 1              THE COURT:  Good morning.  Please be seated.

 2              We're here for argument on Motion to Dismiss in

 3      Bagnall versus Sebelius.  The number's 3:11CV01703.

 4              Could I have appearances, please.

 5              MS. BERS:  Alice Bers for the Center of Medicare

 6      Advocacy for the plaintiffs.

 7              MR. DEFORD:  Gill Deford, also for the plaintiffs.

 8              THE COURT:  Good morning.

 9              MR. McELVAIN:  Joel McElvain from the Department of

10      Justice for the defendant.

11              THE COURT:  Good morning.

12              MR. McELVAIN:  I'm sorry.  And Carolyn Ikari from

13      the U.S. Attorney's Office, also for the defendant.

14              THE COURT:  All right.  We'll hear first from the

15      Government.  It's your motion.  You're free to stand at the

16      podium.  You're also, if you want to look at your notes and

17      you want to stay at the table that's fine, too.  It's up to

18      you.

19              MR. McELVAIN:  I'll go up to the podium, your Honor.

20              THE COURT:  Whenever you're ready.

21              MR. McELVAIN:  May it please the Court.

22              The same plaintiffs' counsel presented precisely the

23      same claim, first, to Judge Hall, and then to the 2nd Circuit

24      several years ago in Landers v. Leavitt.  Both Judge Hall and

25      the Second Circuit upheld the Secretary's reasonable
```

```
1   interpretation of the term inpatient for purposes of Medicare

2   Part A as meaning admitted as an inpatient to the hospital by

3   the attending physician.

4          THE COURT:  Judge Hall also found waiver of

5   exhaustion, too, right?

6          MR. McELVAIN:  She did.

7          THE COURT:  How does that bode for the Government's

8   argument on that point here?

9          MR. McELVAIN:  Well, I would urge the Court to defer

10  to Judge Hall's and the Second Circuit well-reasoned decision

11  on the merits.  I would respectfully take issue with the

12  jurisdictional holding.

13         And the key point on exhaustion is plaintiffs' are

14  directly seeking a claim for benefits.  They asked the Court

15  to award benefits.  And that they simply cannot do under any

16  of the decisions which excuse the exhaustion requirement.

17         THE COURT:  As I read the prayer for relief, they're

18  not asking the Court to award benefits.  There's a request

19  for -- a fairly detailed request for injunctive relief, and

20  then there is in paragraph 4(d) and 4(e), a request that the

21  Court order the defendant to review all coverage decisions

22  for the named plaintiffs and class members to determine

23  whether observation status required each beneficiary to spend

24  more money and then to refund the difference.  That strikes

25  me as being different from a claim for benefits in an
```

1    individual case.  Or is it your position, no, they're exactly

2    the same?

3            MR. McELVAIN:  May I have a moment to obtain my

4    copy?

5            THE COURT:  Sure.  I'm looking at pages 29 and 30 of

6    the complaint.

7            MR. McELVAIN:  Under 4(e) on page 30, they ask upon

8    order the defendants reimburse the plaintiffs for any amounts

9    that they paid for full hospitalization care, refund the

10   difference to the beneficiary.

11           THE COURT:  Right.  But that request is based on

12   sort of an underlying request that the Court find essentially

13   that observation status is invalid, right?

14           MR. McELVAIN:  Correct.

15           THE COURT:  That is not a finding that an ALJ could

16   make, right?

17           MR. McELVAIN:  Well, there's a further refinement of

18   plaintiffs' position which is relevant here.  As I understand

19   the way the plaintiffs have presented their claim in their

20   opposition to the Motion to Dismiss, they believe the correct

21   rule is if you receive services that an inpatient can receive

22   while you're in the hospital you are, therefore, an

23   inpatient.  So they're asking the Court to substitute the

24   Secretary's rule which is a factual rule referring to the

25   complex medical --

1           THE COURT:  Well, it's not really a factual rule.

2    It's a rule that basically hinges on whether or not a doctor

3    decided to formally admitted somebody.  It's that simple,

4    right?

5           MR. McELVAIN:  Correct.  But it's deferring to the

6    physician's determination of the various complex factual

7    matters.  And they wish to substitute their own seperate fact

8    dependent rule delving into what the services are.  So either

9    way there is a highly fact dependent determination that's

10   going on which they're asking the Court to weigh into.

11          THE COURT:  But they've made all kinds of

12   claims -- put aside the issue of whether those particular

13   requests for relief they are actually seeking benefits, I'm

14   not convinced that they are.  But putting that aside for a

15   minute, they've got an APA claim, they're got a claim of

16   notice and comment under the Medicare Act, they've got a

17   claim of failure to publish in the Federal Register.  All of

18   those claims are collateral, right?

19          MR. McELVAIN:  I don't believe so, because they are

20   all devoted to the end result which is an award of

21   benefits.

22          THE COURT:  Well, that could be said in any case

23   that's collateral virtually.  I mean, it is true that in

24   Judge Hall's ruling she said that, well, just because even if

25   they prevail, that doesn't mean they get benefits here.

1   Isn't it the case, she also took account of the fact that the

2   ALJ could not entertain the claims that were before her.  And

3   I think that's true of the APA claim, right?

4            MR. McELVAIN:  Well, it's true, but that's not the

5   end of the inquiry.  Because if they go through the

6   administrative process, they get a decision.  They could win,

7   like Mr. Barrows won, or if they lose, you have a concrete

8   factual determination which would inform the Court's decision

9   not just on the straightforward interpretation of the statute

10  claim but all the other various --

11           THE COURT:  But isn't one of the factors whether the

12  claim is collateral in the sense that -- I guess in two

13  senses:  One, that it really is independent of whether the

14  person is entitled to benefits; and, second, whether the

15  claim could really be entertained through the administrative

16  process which is designed to determine whether the person's

17  entitled to benefits.  Isn't that in part the meaning of the

18  collaterality requirement?

19           MR. McELVAIN:  I'll refer the Court to *Pavano*, a

20  Second Circuit decision, which is it's not collateral if the

21  gravamen of the complaint was that the Government wrongly

22  denied the plaintiffs benefits.  That's what happened here.

23  One relevant consideration I do acknowledge is whether the

24  ALJ could hold that, what have you, but that's not the end of

25  the inquiry, because another important factor that led

1    Congress to impose the exhaustion requirements in the first

2    place was that you needed a final decision, you needed a

3    concrete disagreement in fact at the end of the process to

4    have something for the Federal Court to review.  You don't

5    have that because the claims are still working through the

6    process.  They may end up winning, they may end up losing for

7    different reasons.

8            THE COURT:  But there's nothing about that, if you

9    think of the purposes of the exhaustion requirement, which is

10   to flesh out the record, as you say, to allow the agency to

11   apply its expertise, none of that would help me decide

12   whether the APA was violated, whether the FOIA was violated,

13   whether there's a due process problem with the notice, things

14   like that.  I don't see how it would.

15           MR. McELVAIN:  It would help you.  Here's one

16   particular way.  Take a look at the ALJ decision that

17   Mr. Bagnall received, this is ECF 22-3 on the docket.  He

18   prevailed on his SNF claim because the ALJ found that he

19   could not reasonably have known that he wasn't being treated

20   as an inpatient.  So the ALJ didn't reach the actual

21   underlying issue that whether he was, in fact, an inpatient.

22   They just said he could not reasonably have known.  And under

23   42 U.S.C. 1395pp, he couldn't be held liable for the

24   subsequent stay.

25           THE COURT:  Remind me of that statute again, 42

```
1   U.S.C.?

2          MR. McELVAIN:  1395pp.

3          THE COURT:  And what does that statute say?

4          If you couldn't reasonably have known that you

5   weren't subject to Medicare payment, you will be excused from

6   liability.  It's a rule that applies both to the provider and

7   the patient.  And in Mr. Bagnall's case the rule was applied

8   specifically to him, but not in that decision as to the

9   hospital.

10         THE COURT:  That's interesting.  I don't see how

11  that makes it the case that it would be any easier for me to

12  decide the APA claims, the FOIA claim, the due process claim,

13  if in fact the administrative claims process were

14  completed.

15         MR. McELVAIN:  Well, it is relevant, for example, to

16  the FOIA of patient claim that if if affects -- one of the

17  standards under publication is would it affect the behavior

18  of members of the public.  If, in fact, he's in no worse

19  position because the standard isn't whether he was an

20  inpatient, the standard is whether he reasonably would have

21  known, he's in the same position as to publication.  That

22  resolves his publication claim.

23         THE COURT:  If I were to think that it was necessary

24  to reach that particular piece of the publication analysis, I

25  might agree with you.  I might agree with you.  I'm not sure
```

 1   it is here.  Let's talk about the merit.  Let me ask you

 2   this.  I'm going to have questions for --

 3          MR. McELVAIN:  May I have a moment to retain my

 4   water?

 5          THE COURT:  Sure.

 6          MR. McELVAIN:  Thank you, your Honor.

 7          THE COURT:  Let me ask you to focus on the due

 8   process claim.  In particular, the due process claim as it

 9   relates to, at least as I understand it, one plaintiff.  As I

10   understand it, one of the plaintiffs in intervention,

11   Ms. LeYanna was actually admitted, formally admitted to the

12   hospital, but then her status was changed from inpatient to

13   observation.  And I'm now looking at pages 21 and 22 of the

14   complaint in intervention.  And she was given a notice at the

15   time, but the complaint alleges that the notice was

16   inadequate because it did not inform her of her appeal right

17   or of any ramifications with regard to post-hospital care in

18   the skilled nursing facility.  So I have a couple of

19   questions for you about this situation.

20          First of all, would you agree with me that that

21   particular plaintiff did have a property interest?

22          MR. McELVAIN:  No, I do not agree.

23          THE COURT:  So even though she was accorded

24   inpatient status and, therefore, at that time was entitled to

25   Part A coverage and it was ultimately taken away from her,

1    she, in your view, didn't have a property interest?

2         MR. McELVAIN:  That is the -- that's part and parcel

3    of the inpatient determination is that the doctors can review

4    and the Medicare utilization committees of the hospitals can

5    review.  So that's integral to the definition of what is

6    inpatient.

7         THE COURT:  Right.  But the fact is that a doctor

8    did review it, admitted her, and then that determination was

9    changed.  And so someone at some time made a determination

10   that, in effect, entitled her to Part A coverage.  She was

11   getting, as of a certain time, Part A coverage.  And so why

12   didn't she have a property right in that?

13        MR. McELVAIN:  Because the claimed property right is

14   a claimed right to have all observation services be treated

15   as inpatient, and you have to -- to have a property right --

16        THE COURT:  No, no, no.  Not in that example.  In

17   that example she was admitted.  She was treated as an

18   inpatient and the -- if there's a due process problem, it

19   happened because the notice she received when that status was

20   indisputably taken away from her was inadequate because it

21   didn't inform her she had appeal rights.  So the claimed

22   property right in that situation is not a property right to

23   anything with regard to observation status.  It's a property

24   right to continued designation as inpatient.

25        MR. McELVAIN:  Or to be more precise, if I could,

1    your Honor, the claimed property right is a right to later

2    payment which she can pursue because she'll get the Medicare

3    notice saying this was paid under Part B and she can pursue

4    the ordinary administrative review scheme.

5         THE COURT:  But the issue is -- she got actually

6    more than that notice.  She got more than the quarterly

7    notice, at least what's alleged in the complaint.  She got

8    another notice that said status change inpatient to

9    observation.  And the notice actually, from my perspective at

10   least, or I think even from the plaintiff's perspective, I'm

11   not sure they would acknowledge it, it wasn't bad.  It went

12   to on explain that the treatment care you receive while in

13   observation is no different than if you are admitted as an

14   inpatient, however, the financial responsibility you have may

15   be different.  It's stated that a Medicare beneficiary on

16   observation status may be responsible for the payment of

17   self-administered drugs and the Part B deductible, but it did

18   not mention ramifications for post-hospital care and it did

19   not set forth any right to appeal, describing your right to

20   appeal.

21        So as I understand it with regard to that plaintiff,

22   that situation, what the plaintiffs broadly are complaining

23   about is they're saying, look, she got a notice, but it

24   wasn't adequate to satisfy due process.

25        MR. McELVAIN:  You can't look at that alone.  She

1    also gets the Medicare Part B notice which does tell you you

2    have a right to appeal and makes it about as plain and simple

3    as you get.  You circle what you think is in error, file your

4    appeal.  If you have any questions call this number and we'll

5    help you file your appeal.

6          THE COURT:  But that's months after she's deprived

7    of you what, you and I may disagree, let's assume for a

8    minute she did have a property right for a little while

9    there.  Months later she gets this other notice.  Does that

10   satisfy due process?

11         MR. McELVAIN:  Well, that narrows down what the

12   claims is as I understand what plaintiffs are asserting is

13   that their particular complaint is you're not receiving

14   instantaneous notice and an instantaneous decision.  Even if

15   you get past the property issue, which I would like to

16   reserve, but I think it's quite clear under the three

17   *Eldridge* elements that you can't get to result which requires

18   instantaneous notice.  There would be no decrease in the

19   notice of risk of deprivation, you would very likely increase

20   the risk of erroneous result if you have to make a

21   determination of what money is owed on the spot, as opposed

22   to providing the notice after the fact and allowing the

23   administrative review process.

24         THE COURT:  What I understand what they're alleging,

25   and just for your reference, I'm looking at paragraph 79,

 1    pages 21 and 22 of the complaint in intervention.  As I

 2    understand it -- and I'll ask plaintiff's counsel if I've got

 3    this right -- at least in this particular case she actually

 4    got notice at the time.  In fact, if you look at paragraph 45

 5    of the complaint in intervention, it says that beneficiaries

 6    whose status as admitted inpatient is changed to observation

 7    status, like Ms. LeYanna, by the hospital's URC are supposed

 8    to receive written notification of the change in status,

 9    which she apparently did.  But then it goes on to say the

10    notification essentially, in their view, is not adequate.

11    And so what I'm struggling with is what -- why isn't that, at

12    least on a motion to dismiss claim phase, which is where

13    we're at, why isn't that a plausible due process claim?

14            MR. McELVAIN:  Because they do receive notice in

15    the MSN.  They're informed of their appeal rights.

16            THE COURT:  Months after the deprivation, though.

17            MR. McELVAIN:  Correct.  I don't think that that

18    matters because all we're arguing about is money.  The

19    current regimen is a couple months later you get the notice

20    and you take their appeal there.  What the plaintiffs want to

21    substitute is a determination on the spot with appeals to

22    follow.

23            THE COURT:  In the *Heckler* case in the Second

24    Circuit from 1984, all that was at issue was money as well.

25    It was actually -- I can't remember the type of benefits, but

1    one of the points the Court made there was an astronomical

2    amount of money at issue, which I think is fairly pled here,

3    too.  So I'm not sure simply saying that all that's at issue

4    here is money means that, A, there doesn't have to be notice

5    at the time of the deprivation, right?  I think that's

6    *Heckler*.

7              MR. McELVAIN:  If I misspoke I apologize.  I don't

8    mean to say all that's at stake that's money, there's not a

9    due process issue.  My point is if all that's at stake is

10   money, the timing weighs less heavily in the analysis.

11   They're still going to be able to pursue the same

12   administrative review.  They're going to get their appeal

13   notice if they didn't understand it before.  They don't have

14   to be informed twice of their appeal rights when they are

15   going to get that separate notice.  The only possible

16   difference is you can begin the appeal process more quickly,

17   but nothing's really at stake as to that timing.

18             THE COURT:  Well, I don't know about that.  This

19   woman, Ms. LeYanna, had to front the money for the nursing

20   home.  She had to pay 8 grand.  And there may be other people

21   in the prospective or purported class who may not have been

22   able to afford that amount.  I mean, it's understandable that

23   nursing homes are requiring these people to front the money,

24   because otherwise they may not get paid by some of these

25   people.  So I'm not sure it's quite right to say that

1    ultimately she's going to get the money back anyway if she's

2    right.  Because in Ms. LeYanna's case she apparently did

3    pursue the process and so I'll have questions for the other

4    side about that.  It's a lot of money.  And for some it may

5    effectively make the difference between whether they are able

6    to go to a skilled nursing facility or not, right?

7         MR. McELVAIN:  Possibly.  But, again, you have to

8    work through each of the elements of the *Eldridge* test.

9    First you have to find if there's a property interest.  I

10   don't believe that there is one.

11        THE COURT:  I guess I don't understand how her

12   situation, again, I'm just talking about her, I think I'm

13   more sympathetic towards your argument, I'll hear from the

14   other side, with regard to people who were never admitted

15   into inpatient status.  That's a different issue.  In fact, I

16   think you acknowledge that distinction in your brief, as a

17   footnote in your brief where you acknowledge that those two

18   people may be similarly situated -- excuse me -- differently

19   situated with regard to property interest.

20        How is that different from any Government

21   entitlement that one is receiving, be it -- I get confused

22   with the facts of Eldridge.  That was social security

23   insurance or something?

24        MR. McELVAIN:  I believe so.

25        THE COURT:  That situation, *Goldberg v. Kelly*, how

 1     is the grant of inpatient status different from any other

 2     entitlement that a Government beneficiary will receive?

 3          MR. McELVAIN:  Because it goes to the term

 4     entitlement.  You've got to have a clear non-discretionary

 5     right to receive that benefit.  That's *Furlong v. Shalala*.

 6          THE COURT:  Correct.  But that's been established in

 7     her case.  She has been admitted -- it all turns on whether

 8     she's been admitted to the hospital as an inpatient and she

 9     was.

10          MR. McELVAIN:  I don't agree with that, because it's

11     not just the fact that there was a form.  It's the whole

12     process in the hospital which is the doctor's decision is

13     reviewed by the committee, and that's the final decision of

14     the hospital.  And that's what triggers the right to

15     inpatient status.

16          THE COURT:  But how is that different from in a

17     welfare situation and somebody is given benefits for a while

18     and then some supervisor looks at it and says, no, they're

19     not entitled, and they take it away.  You're going to get all

20     the due process that you would get under *Goldberg v. Kelly* in

21     that case, right?

22          MR. McELVAIN:  Because if the Government is making

23     the decision to take away the benefit for some reason that

24     isn't error, and they have an asserted right under the Social

25     Security Act or whatever to that particular benefit, then

1    that's a property interest.  But here the decision is left to

2    the physician and to the hospital, and Medicare doesn't speak

3    to what --

4              THE COURT:  So simply because essentially the

5    hospital's acting as the Government agent here and the

6    doctors and the URC members are not Government employees,

7    that makes all the difference as to whether there's a

8    property right?

9              MR. McELVAIN:  Well, I would dispute the claim that

10   they're operating in the form of an agent relationship.  The

11   Medicare rule is you're an inpatient if you're treated as an

12   inpatient by the hospital.  And --

13             THE COURT:  Actually, the rule is if you're admitted

14   as an inpatient.

15             MR. McELVAIN:  Correct, yes.

16             THE COURT:  Right.

17             MR. McELVAIN:  But that reserves the possibility

18   that the hospital can review its own procedures.  The

19   hospital has to review its own procedures because they have

20   to make sure that they're presenting claims themselves to

21   Medicare for payment --

22             THE COURT:  But I'm struggling to see any difference

23   between that situation and the hypothetical I gave you about

24   the supervisor in the welfare office other than the fact that

25   in my hypothetical everybody works for the Government and in

1   this situation not everybody works for the Government.

2        MR. McELVAIN:  It's a discretionary determination.

3   I guess what I should say with the Social Security

4   hypothetical, it's a little bit difficult to answer that one

5   because I'm not sure exactly what statute would be at issue

6   in that hypothetical.  If there was a clear entitlement to

7   benefits in the Social Security case, there's a property

8   interest and due process analysis is triggered.  If for some

9   reason, and I'm not familiar with all chapter and verse with

10  the Social Security Act, if somewhere in there there was some

11  discretionary determination and the supervisor said to the

12  line processor, no, that discretion should have been

13  exercised differently, still the end result of the

14  totality of the process is a discretionary determination.

15       THE COURT:  That was true of *Eldridge*, too, right?

16  Gainful activity or whatever it was, there was some standard

17  that some doctor would determine if the person met.  How is

18  that different?

19       MR. McELVAIN:  Again, it's a discretionary

20  determination.  The whole point of the Medicare rule at issue

21  here is it's complex medical judgment that we defer to the

22  medical professionals on.

23       THE COURT:  And wasn't that true in *Eldridge*, too,

24  with regard to the Social Security disability determination?

25       MR. McELVAIN:  Well, I don't believe so.  Again, I

1    don't want to claim more knowledge of the Social Security Act

2    than I have, but my understanding is the Social Security Act

3    has a very detailed set of factors of substantial gainful

4    activity means A, B, C, D and E.  And if that, in fact, were

5    being misapplied, then I could see the claim that the

6    property interest was being violated.

7          THE COURT:  Let me ask you this question.  I got

8    your recent submission about a new rule making.  You say in

9    your brief that that supports your motion to dismiss, but you

10   don't say why.  Maybe you can tell me why.

11         MR. McELVAIN:  The silence did speak volumes there.

12   In truth, your Honor, I don't think that the notice has all

13   that much relevance on the case.

14         THE COURT:  I agree with you.

15         MR. McELVAIN:  It's a development I wanted to be

16   sure the Court was aware of.

17         I think it would resolve a number of the prospective

18   claims for relief if the Court were ever to reach them, but I

19   don't think we're anywhere close to discussing.

20         THE COURT:  Right.  Because I take it that even if,

21   A, the rule was adopted in its current form, and even if, B,

22   it were applied retroactively, I take it these plaintiffs

23   still couldn't benefit because the problem most of these

24   plaintiffs had is the doctor did not admit them.  And that's

25   not going to be changed by this rule.

1          MR. McELVAIN:  Correct.  And the proposed rule does

2     not change very much at all on that score.  The rule still is

3     that the centerpiece of the issue is whether you have a

4     hospital admission order -- an inpatient admission order from

5     the physician and from the hospital.  So that really does not

6     change at all with respect to beneficiaries.  There is some

7     slight tweaking with respect to the provider submissions of

8     claims as to what will be determined to be presumptively

9     reasonable or not.  But from the beneficiary's perspective,

10    not very much has changed at all.

11         THE COURT:  Okay.  Okay.  All right.  Do you have

12    anything else you want to tell me?  Let me see if I have any

13    other questions I wanted to ask you.

14         So your argument that Ms. LeYanna's situation is not

15    a property interest is because it's a, number one, it's a

16    discretionary determination.

17         MR. McELVAIN:  Correct.

18         THE COURT:  And, number two, it's made by the

19    hospital, not by the government.

20         MR. McELVAIN:  That's really two formulations of the

21    same argument, the discretionary determination that is left

22    to the judgment of the medical professionals in the hospital.

23    It just underscores how discretionary it is.  But, again,

24    it's really two ways of stating the same argument.

25         THE COURT:  Let's see.  I don't think I have any

1    more questions for you.  You're welcome to continue.

2              MR. McELVAIN:  The one point I'd just like to add is

3    to emphasize the *Landers* decision which I think is quite

4    controlling of most, if not all, of the merits claims the

5    plaintiffs have raised.  I do not find the plaintiffs'

6    attempt to distinguish the *Landers* precedent to be

7    persuasive.  It's exactly the same claim, exactly the same

8    interpretation at issue, which the Second Circuit found to be

9    a higher persuasive interpretation.  So I would urge the

10   Court to follow the *Landers* decision on that score.

11             THE COURT:  All right.  I may have some questions

12   for you later.

13             MS. BERS:  Thank you, your Honor.  So, as you know,

14   the case challenges the Secretary's policy and practice of

15   classifying hospital patients as observation status under

16   Medicare Part B rather than under Medicare Part A.  Patients

17   who stay in the hospital on regular medical floors, but

18   they're being classified as Medicare Part B as outpatients

19   rather than under the Medicare Part A hospital benefit which

20   has dramatic affects on coverage.

21             THE COURT:  Can I ask you a question?

22             I guess the first question I have is to pick up on

23   the Government's closing point which is why doesn't the

24   *Landers* case dispose of, at the very least, Count One, that

25   portion of Count Two and Count Three that assert that the

 1    rule is legislative, and Count Five?

 2            MS. BERS:  Just remind me, Count Five is?

 3            THE COURT:  Count Five is I believe the claim is

 4    that the use of observation status is arbitrary and

 5    capricious in violation of the administrative procedure.

 6    Count One is that the use of observation status violates the

 7    Medicare Act.  And Counts Two and Three I believe are that

 8    the rule is adopted without notice and comment.

 9            MS. BERS:  Well, as the Second Circuit stated,

10    *Landers* was a case about how to count to three.  The *Landers*

11    class was challenging how time was counted toward the

12    three-day stay requirement.  There's a statutory requirement

13    for three-day inpatient stay and that's the section of the

14    statute that the *Landers* court was interpreting.

15            THE COURT:  But didn't the *Landers* court expressly

16    upheld the definition of inpatient as being one who is

17    formally admitted as an inpatient?

18            MS. BERS:  Yes, they did.

19            THE COURT:  And doesn't that ruling make it very

20    difficult for you here?  In other words, you say that you're

21    challenging observation status, but it seems to me that the

22    observation status or the use of observation status isn't

23    really what's injuring your clients.  Because even if that

24    rule about observation status were not on the books, were not

25    in the manual, seems to me, or let me ask you, wouldn't it be

1    the case if the observation status did not exist but

2    everything else here was the same with regard to your

3    clients, wouldn't your clients be in exactly the same

4    situation that they are now?

5         MS. BERS:  No, your Honor.  This claim is about the

6    classification of observation status as Medicare Part B.  If

7    observation status didn't exist, the question would be how

8    they would be classified.

9         THE COURT:  Well, suppose that your clients in --

10   exactly the same thing happened.  Your clients were brought

11   to the hospital either through the emergency room or that

12   they weren't given a particular status.  The doctor said,

13   hey, look, we're not going to admit him yet.  We're just

14   going to watch him for a while.  We're just not going to

15   admit him.  We'll run some tests.  They didn't use the words

16   observation status, but they didn't in fact admit him, just

17   as in fact happened.  You'd be in exactly the same situation,

18   wouldn't you?

19        MS. BERS:  The question is how would those patients

20   be classified during that sort of gray area time.  And it's

21   those service which are now being called observation

22   services, the classification of those services under Part B

23   that plaintiffs are challenging.

24        THE COURT:  But until there is a formal admission,

25   you're not going to get coverage under part A, right?

1          MS. BERS:  You won't be able to count the time

2     toward the three-day stay requirement.

3          THE COURT:  Well, it's more than that.  You pointed

4     out that there are other consequences too.  The co-payments

5     apply, the drug reimbursement is different.  And so until you

6     are formally admitted as an inpatient, and this is the rule

7     the Second Circuit upheld, you don't get coverage under Part

8     A, regardless of whether you're in the emergency room,

9     observation status, or what they call you.

10          MS. BERS:  It's what your Honor just said about you

11     don't get coverage under Part A., That's the point that we're

12     challenging here.  And that's the point that the *Landers*

13     court assumed without deciding.  The *Landers* court assumed

14     without deciding that it was okay for Medicare patients on

15     observation status to be categorized as Part B.  That was

16     assumed but not considered.  What we're considering is that

17     classification question, at what point people come under Part

18     A.

19          THE COURT:  But here's what I'm struggling with.

20     I'm sorry to quibble with you on this.  What difference does

21     it make how they're classified as long as they're not

22     formally admitted?  How could it matter?  It all hinges, it

23     all being admission to Part A benefits, if that all hinges on

24     being formally admitted, what difference does it make how

25     they're classified before that happens?

1          MS. BERS:  If observation status stopped being used

2     as a billing mechanism, the patients would have to be

3     classified under some other part of Medicare and, presumably,

4     that would be Medicare Part A.

5          THE COURT:  Why?  Why presumably?

6          MS. BERS:  Well, there is no other requirement.

7     Either they need to be in the hospital or they don't need to

8     be in the hospital.

9          THE COURT:  They could be in the emergency room.

10    The doctor could just say, well, general outpatient.  We're

11    going to do some MRI testing.

12         MS. BERS:  We don't think that would be in keeping

13    with the statute.  The statute sets up hospitalization

14    coverage.  The intent of Congress back in 1965 when it

15    established the Part A benefit was to provide for hospital

16    coverage and a continuum of care from the hospital through to

17    the nursing home.  Observation status didn't exist in 1965

18    which the agency has acknowledged.  And, yes, as medical

19    practices changed, there are patients who are labeled

20    observation status and we sort of have this gray area now

21    that we didn't use to have.  But putting that gray area under

22    Medicare Part B is what we're challenging here.

23         THE COURT:  I understand that.  Let me go to a

24    second point which you just raised which is how this shift

25    happened.  I take it that from your brief that what really

1    happened here, this development or increased use of

2    observation status, has been driven by really financial

3    incentives and, in particular, the incentive that if you

4    submit a claim for Part A and it's rejected, you can't then

5    bill it for Part B.

6          MS. BERS:  That's the current situation and that is

7    what's driving a lot of the decisions right now.  I would

8    refer to the brief of the American Hospital Association for a

9    pretty detailed analysis the massive fraud case that the

10    hospitals are facing from this classification.

11          THE COURT:  But you're not challenging that

12    particular rule, right?  The rule that says -- which I now

13    understand they're proposing to change as well -- but I

14    didn't see that you're challenging the rule that says if you

15    can't bill -- if you bill for Part A and it's rejected, you

16    can't then bill for Part B.

17          MS. BERS:  That's the providers.  That's not our

18    claim.  That's something that affects the providers.

19          THE COURT:  But that is, in fact, what's driving the

20    change, right?

21          MS. BERS:  We think that is what is driving the

22    change.  And since observation status didn't exist, and it's

23    not mentioned in the statute, the words aren't mentioned in

24    the statute or the regulation, you can see, though, how it

25    did creep into the Medicare world through some of the

1    discussions that happened in the Federal Register that the

2    Secretary pointed out in hear brief.  It started out as being

3    associated with a few specific diagnoses, it got expanded to

4    cover all circumstances.  And with nothing in the statute

5    about that, it came in its current form in the manual as a

6    guidance which is, you know, normally the decision can be

7    made in 24 and almost always under 48 hours.  But the reality

8    of what's happening is that doctors' judgment is being second

9    guessed by the Hospital Utilization Review Committee based on

10   the proprietary guidelines that Medicare is using.  Again,

11   nothing in the law about what factors are supposed to be used

12   here.

13           THE COURT:  But the second guessing occurs all the

14   time, right?  I mean, it occurs with regard to determinations

15   of whether services are medically reasonable and necessary.

16   It happens, frankly, any time an insurance company rejects a

17   medical claim.  If that's enough, as the Court said, I can't

18   remember the name of the case, *Goodman*, I think, if that's

19   enough to violate the provision that bars the Government from

20   interfering with the practice of medicine, well, then, you

21   know...

22           MS. BERS:  Again, I would refer to the American

23   Hospital Association brief for the far more than tangential

24   influence that's being inserted in this case.  But the

25   problem that plaintiffs are challenging is its use, its rise

1    as a billing mechanism.  If observation status was simply a

2    medical concept -- it makes sense as a medical concept -- you

3    go to the hospital not because you know exactly what's wrong

4    with you, but because you're sick.  And as a medical concept,

5    you know, it absolutely makes sense.  As a billing mechanism,

6    as a determinate of coverage, that's what plaintiffs are

7    challenging here.

8         THE COURT:  Right.  But I think the point you're

9    making is that it's being increasingly used or, I guess you

10   would probably say misused, because of financial incentives,

11   right, that affect the hospital?

12        MS. BERS:  Yes.

13        THE COURT:  And so this kind of goes to your

14   administrative procedure claims.  What exactly is the

15   Government action that you're challenging here?

16        MS. BERS:  The Government action that we're

17   challenging is using observation status to classify patients

18   as Part B.  And in the way that they're doing it, using

19   proprietary guidelines and making that claim

20   non-reviewable.

21        THE COURT:  But the Government's not the one that's

22   really doing that, is it?  These are doctors making decisions

23   about admissions, utilization review committees.  What I'm

24   really trying to get at is part of your administrative

25   procedure claim is hey, listen, there's been a change that

1    wasn't subjected to notice and comment.  I'm trying to figure

2    out what's the change that wasn't subjected to notice and

3    comment here.

4          MS. BERS:  The change was essentially carving out

5    part of the Part A hospital benefit and putting that into the

6    Medicare Part B benefit without notice or comment.

7          THE COURT:  So what rule or what manual provision is

8    the offending action?

9          MS. BERS:  It's not embodied in a single manual

10   provision.  It's embodied partly in the manual provision

11   which is in Chapter Six of the Medicare Policy Manual which

12   talks about observation status and gives that guidance about

13   usually 25, rarely more than 48 hours.  It's partly embodied

14   in the proprietary guidelines which the general public does

15   not have access to.

16         THE COURT:  But those aren't guidelines adopted by

17   the Government.

18         MS. BERS:  Well, they're used by Medicare.  That's

19   why the hospitals are using them.  They're using them because

20   the Medicare contractors are using them.  They're using

21   guidelines that there's no reference to in law for.

22            And, you know, as far as the statutory claim, as I

23   mentioned, it's the taking out, it's sort of a rewriting of

24   the statutes, carving out what for decades were presumed to

25   be Part A services and classifying them as Part B.  Plaintiff

1    Frederick Ruschmann, for example, who went in for surgery on

2    his foot, removal of a melanoma and skin grafts, and was in

3    the hospital for three days and had to relearn how to walk,

4    would be the classic example of someone who required skilled

5    nursing facility follow-up care, 20 years ago there would

6    have been no question.  He would have gotten that skilled

7    nursing facility care.  He would have been classified as a --

8         THE COURT:  Because he would have been admitted to

9    the hospital on the first day.

10        MS. BERS:  Presumably he would have been.  He would

11   have been a Part A inpatient.

12        THE COURT:  See, I think we've come back to this is

13   all about when you get admitted which really boils down to

14   the very same issues the Second Circuit was considering in

15   *Landers*.  This is all about inpatient status.

16        MS. BERS:  That day had been pushed further and

17   further back, and the *Landers* court didn't examine why that

18   was happening and how that decision is made, how the

19   classification is made.

20        THE COURT:  Right.  But regardless of why they

21   considered why it was happening, they upheld the definition,

22   which is your problem here I think.  I think your problem is

23   this definition hinges on a doctor making a decision when to

24   admit and, unfortunately, there are these financial

25   incentives that are affected when the doctor does that.

1           MS. BERS:  The plaintiffs in *Landers* accepted their

2     Part B designation and were saying count that time for the

3     three days, the plaintiffs in *Landers*.  The plaintiffs here

4     in Bagnall are not accepting that designation and not

5     accepting that they're being classified as Part B.  And, yes,

6     you know, if it was doctors actually making the decision that

7     would be one thing, but the reality is that the -- because of

8     the policy here being driven by the Secretary and by this

9     mass enforcement actions against the hospitals, the doctors'

10    decisions aren't really what's at play here.  It's the policy

11    of the Secretary.

12          THE COURT:  Let's discuss the due process claim for

13    a minute.  So with regard to the plaintiffs -- am I correct

14    that Ms. LeYanna is -- I apologize if I'm mispronouncing her

15    name -- but Ms. LeYanna, one of the plaintiffs in

16    intervention, is she the only one who was originally

17    Designated as inpatient and then had her status changed?

18          MS. BERS:  She was the only one who was actually

19    given a notice of the switch, the retroactive switch from

20    inpatient to outpatient.  She's the only one of 14 plaintiffs

21    who was given the notice which they are supposed to be

22    given.

23          THE COURT:  When you say they're supposed to be

24    given, what's the source of law that requires that?

25          MS. BERS:  There is a regulation that talks about

1    notice for patients who -- where it's found that inpatient

2    care is no longer necessary.

3            THE COURT:  It's in the CFR?

4            MS. BERS:  Yes.

5            THE COURT:  Do you happen to have the cite?

6            MS. BERS:  Bear with me for one second.  I don't

7    have it in my notes, but I do think I have it in the brief

8    which I could point out to you.  But I would say that she was

9    the only one who was given that notice.  And that in itself

10   is telling because that is supposed to issue.

11           There were other plaintiffs who were essentially

12   given misinformation because Dr. Bagnall, for example, signed

13   a piece of paper saying he was an inpatient.  At some unknown

14   point that status was changed to outpatient, but we don't

15   know when and he was never told.

16           THE COURT:  So from your perspective, the record's a

17   little fuzzy on whether he was admitted or not?

18           MS. BERS:  Yes, it is.  And that's often the case

19   when you look at these medical records.  It's hard to tell.

20   Even the word "admit" doesn't necessarily mean the person was

21   admitted for inpatient status.  It could mean they were

22   admitted for observation.

23           THE COURT:  But some of the plaintiffs, at least as

24   I understand it, there was no fuzziness.  They just weren't

25   admitted.

1          MS. BERS:  Some were never admitted.

2          THE COURT:  For those folks, where's the property

3     right?

4          MS. BERS:  The property right is in coverage

5     of -- excuse me one minute.  Receiving coverage of medical

6     services is the property right.  And it would be quite a

7     departure from case law in Second Circuit, in particular,

8     like, for example, the *Kraemer* case to say that there is no

9     property interest in having coverage of medical services.

10    That's in the *Kraemer* case.  That's also in --

11         THE COURT:  Did any of those cases, though, involve

12    a situation where the person had not been deemed to qualify

13    for the benefit?

14         MS. BERS:  Well, it was, for example, in *Kraemer*, it

15    was termination, I believe, of inpatient services by

16    Utilization Review Committee.

17         THE COURT:  Right.  And so the person had the

18    services and it was taken away.  That I understand.  I think

19    that's a decent claim to a property interest.  What I'm

20    trying to understand is the other category who didn't have

21    it, who you say should have been given it, but were never

22    given it.

23         MS. BERS:  Well, I think the *Grijalva* case is about

24    notice and due process in general in the Medicare Part C,

25    which is the Medicare through private companies section of

1    the program.

2            THE COURT:  What's the name of the case?

3            MS. BERS:  *Grijalva*.

4            THE COURT:  And that's in your brief?

5            MS. BERS:  Yes.

6            THE COURT:  In that case the claimants were actually

7    accorded the status and it was taken away?

8            MS. BERS:  Well, it wasn't about status.  It was

9    about a general coverage of any medical service where people

10   weren't being given notice and appeal rights.

11           I would also just like to say that the -- they're

12   being deprived of Part A coverage whether or not they were at

13   first admitted to inpatient status or not.  Plaintiff's claim

14   is by being put in observation status in the situation that

15   they were in, right there they're deprived of Part A status

16   in the hospital which they're supposed to receive and

17   effectively at the follow-up care.  So there's a deprivation

18   of Part A coverage even when they weren't initially put on

19   inpatient status.

20           THE COURT:  I understand.  We're going to come back

21   to the same debate we've been having, though.  From my

22   perspective, the reason that they're not getting Part A

23   coverage is not so much because what they'll be called on

24   observation, they're in the emergency room, they're

25   diagnostic, they're outpatient.  It's because they're not

1    admitted.  That's really where the rubber hits the road here

2    it seems to me.  And if that's true, *Landers* forecloses that

3    claim it seems to me.

4            MS. BERS:  We'll go back to the same discussion we

5    were having which is they didn't discuss how that

6    determination was made.

7            THE COURT:  But I need to know from you whether you

8    have a case that involved the recognition of a property right

9    where the status of being entitled to benefits had not been

10   accorded to the person.

11           MS. BERS:  I think that the *Grijalva* case would be

12   the closest.  I would also say that the private interest in

13   receiving coverage of medical services is stated explicitly

14   in the *Voyster* (ph) case and the *David* case where it's

15   explicitly stated that there is a private interest in

16   receiving coverage of medical services and that triggers due

17   process protection.

18           THE COURT:  Let me ask you a couple of other

19   questions about the due process claim.  Let's stick with

20   Ms. LeYanna for a minute.

21           In what way -- I read the complaint, including the

22   allegations about her, as well as paragraph 45, as saying

23   that the notice was given, but it was not adequate.  Is that

24   right, to satisfy due process?

25           MS. BERS:  That's correct.

 1              THE COURT:  In what ways was it not adequate?

 2              MS. BERS:  It didn't -- most importantly, it didn't

 3    have any indication that there was a right to challenge the

 4    classification.

 5              THE COURT:  And yet she did.

 6              MS. BERS:  She did.  She got some advice and tried

 7    it and then was completely blocked in both of her attempts,

 8    appealing both the hospital classification and the nursing

 9    home denial.  She was completely blocked.  She actually

10    happened to be the one to get letters, official letters from

11    Medicare saying this is not appealable.

12              THE COURT:  But let's focus on the notice itself,

13    because what happened later -- I'm not sure that what

14    happened later really relates specifically to your due

15    process claim.

16              MS. BERS:  Well, it does, your Honor, because the

17    plaintiffs beneficiaries, members of the class, who don't

18    find their way to experienced advocates have no realistic

19    opportunity to challenge their classification.  And if by

20    some reason they get over these hurdles and try it, they can

21    wind up blocked like Ms. LeYanna.  If they get into the

22    administrative appeal system, they may be told that there's

23    no jurisdiction or that there's no amount of in controversy.

24    They may be told any number of things.  It's very important

25    what happens later, because there is no way that the average

1    beneficiary can access the appeal -- the appeal system such

2    as it is that exist or navigate their way through if they

3    happen to get there.  It's very important to note, you know,

4    in this situation the current appeal system is simply not set

5    up for observation status challenges and it's not working for

6    observation status challenges.  This was an important point I

7    wanted to make.  The Secretary's brief makes it sound like

8    it's the easiest thing in the world to circle that and send

9    that in.  The problem is that there's no denial.  When you

10   get the Medicare summary notice for the hospital claim, that

11   comes through as a covered Medicare Part B claim.  And

12   beneficiaries may, first of all, may not even think to appeal

13   something that's covered.  They're not told anywhere in that

14   notice that the coverage of your -- this could have been

15   covered under Part A or the coverage of Medicare Part B in

16   this case is effecting, for example, the non-coverage of your

17   follow-up care in the nursing home.  Or even if they think

18   about appealing it, they may think I don't want to risk

19   appealing a covered claim.  I may lose all coverage.

20           THE COURT:  I hear you.  Let's go back to

21   Ms. LeYanna for a minute.  Because she was given a notice.

22   She was given a notice at the time she was hospital, title

23   status change inpatient to observation.  It actually informed

24   her that the financial responsibility she had might be

25   different.  It further told her that she might now be

1    responsible for payment of self-administered drugs and

2    deductible and co-insurance.  And it even gave her a number

3    to call for more information.  Why wasn't that enough?

4         MS. BERS:  Well, that begins to be the kind of

5    notice that we would envision class members getting, but it

6    doesn't actually say that this is an appealable

7    classification.

8         THE COURT:  Do you have authority that would say

9    that to satisfy due process it had to go further and inform

10   her specifically that she had an appeal right?

11        MS. BERS:  Well, I think that the *Kraemer* case, *Gray

12   Panthers* and *G*rijalva do, which are the main cases we rely on

13   in our brief talk about, in particular, giving specific

14   reasons for denial and giving people enough information to

15   act on.  That's not being done here.  They're not being

16   told -- they're not being told that they can appeal it in

17   that notice that Ms. LeYanna got, for example.  And even if

18   they wanted to, they don't have access to those proprietary

19   guidelines which are used to make the classification.

20        It's also important to note plaintiffs have alleged

21   that notice usually doesn't issue, like it didn't for

22   Dr. Bagnall.  I think plaintiff Morse was also someone who

23   was given a sheet saying that she was an inpatient and not

24   given anything saying she was an outpatient, but later found

25   out that she was.  So the notice and appeal issues are

1      just -- it's not working the way it is.

2           One point I want to make about that is that the

3      reality is there is no -- there's no working appeal system.

4      There is a great private interest at stake, Part A coverage

5      of hospital and nursing home care, the most expensive part of

6      medical care.  There's a great risk of erroneous deprivation.

7      The classification is illogical.  A reasonable person or the

8      family member would have no reason to question that they were

9      an inpatient in the circumstances that we've described.  The

10     proprietary guidelines aren't accessible.  People don't know

11     which criteria they aren't meeting.  They can't mount a

12     serious challenge to that.  That would be supported by *Gray*

13     *Panthers* and the *Grijalva* case.

14          THE COURT:  Did the *Gray Panthers* and the *G*rijalva

15     case that you mentioned involve secret or unpublished rules

16     in use by the Government or in use by private parties.

17          MS. BERS:  That was by the Government.  In *Grijalva*

18     it was decided that the Part C plans were, in effect,

19     Government actors.  But I would also make an analogy to the

20     *Fox v. Bowen* case that was District of Connecticut case that

21     involved the application of an improvement standard.  Also,

22     the *Jimmo v. Sebelius* case which was in the District of

23     Vermont, a recent case in the District of Vermont, that also

24     involved Medicare.  And the City of New York and the State of

25     New York older cases from the Second Circuit where there was

1    a clandestine policy at issue.

2            THE COURT:  Can I ask what's your position on this

3    new rule making?

4            MS. BERS:  The new rule, as you said, we don't know

5    exactly how the rule will play out.  We don't know if it will

6    go into -- take effect, we don't know when.  We don't know if

7    it will go into effect in the form that it is currently

8    written.  We do know that it doesn't address the notice and

9    review issues at all.  And most importantly, as you stated,

10   the class has already been harmed and they won't get relief

11   from this new rule.

12           THE COURT:  Well, can I ask you this question.

13   Suppose just for a minute that I were to say, look, I think

14   Ms. LeYanna has a good due process claim, because she's

15   someone who was accorded inpatient status and was taken away.

16   And at least at the motion to dismiss stage, she has a

17   plausible claim that the notice was not adequate.  Are there

18   enough people in that situation to make a class?  I know I

19   didn't tell you get ready to argue class certification today,

20   that's fine.  I'm kind of curious about that.  Would there be

21   a class then?

22           MS. BERS:  If there were just people that had been

23   switched?  We don't know the exact number.  We do know that

24   that happened and it's happening increasingly.  I believe it

25   was in 2004 when the agency actually put forth a code that

1   allowed Utilization Review Committee to do this retroactive

2   switching.  I believe that's also when advocates started

3   seeing people in this situation in much more appreciable

4   numbers.  It is logical to assume that there are many people

5   in that situation.

6           Just to add, though, Ms. LeYanna was given a notice

7   that wasn't adequate.  There are so many people who were

8   given no notice at all.

9           THE COURT:  Yes, but not in her situation, though.

10  Not in a situation where they were accorded the arguable

11  property right and then it was taken away.

12          MS. BERS:  Well, your Honor, where we know for sure.

13  I mean, it's very fuzzy in some of these records with

14  Dr. Bagnall, with Ms. Morris, with Mr. Holt who, again, a

15  fuzzy situation.  He was on, I think, inpatient status for a

16  little while and then was given actually what looked like a

17  notice saying you're no longer inpatient, but it wasn't a

18  switch to observation status.  It just saying you're no

19  longer eligible for inpatient hospital care.  And his son

20  tried appealing.  That does contain the appeal rights.

21  That's the standard, you don't meet the hospital level of

22  care requirements notice.  His son tried appealing that and

23  then was told, oh, no, this is a system for people denied

24  inpatient status.  You were on observation status.  That's

25  not what this system is for.

1          So people are being very misled, either given no

2    notice, given notice that doesn't apply to them.  Being told

3    they're inpatients at first and then not being told when

4    they're switched to outpatient status.  So there's a real

5    problem for people who aren't switched as well.

6          THE COURT:  Anything else you'd like to tell me?

7          MS. BERS:  I think that's all, your Honor.

8          THE COURT:  Very well.  Thank you.

9          Mr. McElvain.

10          MR. McELVAIN:  Your Honor, I'd like to return to the

11    issue of the due process with respect to Ms. LeYanna.  And I

12    believe -- I do acknowledge that she's in a different

13    position because of the original inpatient admission form,

14    but I think ultimately the due process analysis is the same

15    because the question is at that moment in time did she have a

16    clear right, non-discretionary right, to continue in an

17    inpatient status, and the answer to that is no, because it is

18    still left to the discretion of the hospital to make the

19    complex medical judgment.

20          THE COURT:  I didn't bring *Eldridge* with me, but my

21    recollection is, and I may be thinking of another case, is

22    that the court in *Eldridge* said, look, we're going to rely on

23    doctors to make this subjective determination as to

24    substantial inability to participate in substantial gainful

25    activity.  Again, if I have the facts wrong, I'm sorry.

```
 1              I'm not seeing the difference here.  I mean, here
 2     the doctor is supposed to make a complex medical judgment as
 3     to whether the person should be admitted.  There the doctor
 4     is supposed to use medical sources, his or her medical
 5     knowledge, to make a determination of whether the person can
 6     continue to be employed in substantial gainful activity.  In
 7     both cases it's a judgment call.  Does that mean there's no
 8     property interest?
 9              MR. McELVAIN:  Well, it's not quite a judgment call
10     in Eldridge.  Again, I don't want to claim more precise
11     knowledge of the Social Security Act than I can represent,
12     but it's my understanding that under the Social Security Act
13     there are objective criteria for substantial gainful
14     activity, which is if you can do A, B, C and E, you're
15     capable of substantial gainful activity.  So doctors do make
16     that determination, but there are precise criteria that they
17     need to --
18              THE COURT:  There are some criteria for inpatient
19     status, too, right?  Even before the notice of proposed rule
20     making, there are some timing things about probably not more
21     than 48 hours, things like that.  There are some services
22     that are listed.  So it's not like there are no criteria.
23              MR. McELVAIN:  True.  But it's all an issue of
24     balancing and it's left to the judgment of the doctor as to
25     whether to do the balancing.  The difference here is under
```

1    the Social Security regime there is something that could be

2    determined to be wrong.  If the doctor misstated whether

3    they're capable of, you know, typing for an hour a day or

4    whatever the rule was, that's something that you could

5    objectively determine the doctor was wrong on, and if you

6    were, in fact, not so capable, you did have a determinable

7    non-discretionary right to receive the benefit.  Here, if the

8    claim is they misjudged the categories and they really should

9    have gotten the hospital admission for them but they didn't,

10   that's not a claim against the -- because the still bottom

11   line rule is the hospital exercised its judgment not to treat

12   you as an inpatient so the benefits are not forthcoming with

13   the proviso, of course, that if you could not reasonably have

14   known if you were treated inpatient you would still get the

15   benefit, but leaving that aside for the moment.

16          THE COURT:  So that the point you're making is it

17   doesn't matter whether they've accorded you the status.  What

18   matters is really the criteria for the status.  And if those

19   criteria are simple and objective, then there's a property

20   right.  And if those criteria are, as you put it,

21   discretionary, there's not.

22          MR. McELVAIN:  That's right.  That's right.  If it's

23   left to the discretion of the decision-maker.

24          THE COURT:  What's your best case on that for that

25   distinction?

1        MR. McELVAIN:  There are a number of Supreme Court

2   cases that talk about discretionary.  There's *Town of Castle*

3   *Rock*, I believe, cited in our brief.  *Furlong v. Shalala*.

4        THE COURT:  Let me ask you about the experience of

5   Mr. Barrows.  Doesn't that suggest the treating physicians in

6   the hospital do not have unlimited discretion and, therefore,

7   that there would be a protectable property interest?

8        MR. McELVAIN:  Because he prevailed under the

9   Medicare Appeals Council?

10       THE COURT:  Yes.  Ultimately, if he had foregone the

11  S and F care despite being entitled to it for financial

12  reasons, I mean, we'd have a situation where the delayed

13  notice would have denied him benefits.  He'd have an injury.

14  There would have been arguably ultimately -- I guess what

15  you'd say to that is it doesn't change the fact that it's a

16  discretionary determination in the first instance.

17       MR. McELVAIN:  Correct.  He did end up prevailing

18  and he won and, of course, all the better for him, but that

19  one decision does not amount to creating a property interest

20  for the whole universe.  Again, referring back to the *Furlong*

21  case, they talked about a pattern of administrative

22  decisions, hundreds of decisions.

23       THE COURT:  Although ultimately, though, if an ALJ

24  is capable of reviewing the doctor/hospital's determination,

25  they must do so applying some criteria -- some objective

1  criteria, right?

2       MR. McELVAIN:  Right.

3       THE COURT:  So it's not discretionary to the point

4  where the ALJ SAYS, hey, look, you've got a professional

5  doctor, I'm not going to second guess his judgment.  To the

6  contrary, the ALJ said, no, he got it wrong.  The ALJ may or

7  may not be a doctor.  He's applying legal criteria pursuant

8  to that determination.

9       MR. McELVAIN:  The rule that Medicare follows with

10 respect to beneficiaries -- now providers are a different

11 issue.  If they do -- some of the claims you have to review

12 the reasonableness of the claim.  But as to the beneficiary,

13 if you have not been admitted as an inpatient, you're not an

14 inpatient.  You don't get Part A.

15      THE COURT:  Right.

16      MR. McELVAIN:  Now, in a number of cases, and you

17 can look through some of the administrative decisions,

18 sometimes it becomes ambiguous as to whether or not

19 they're -- one form -- might be one form describes them as

20 inpatient, one that might not.  In that sort sense the ALJ

21 decisions are sorting through -- well, where they've admitted

22 where the evidence was ambiguous whether there was an order

23 or not.  There's language in some of the administrative

24 decisions where sorting through what we believe is the proper

25 question which is just simply were you admitted, they go on

1    to address the objective medical evidence that those

2    administrative decisions that CMS as an agency as a whole

3    does not necessarily endorse them.  They exist and

4    beneficiaries like Mr. Barrows have received relief from

5    that.

6            THE COURT:  Let me make sure I understood what you

7    just said.  There are, in fact, decisions the ALJ effectively

8    reverses the determination as to whether to admit?

9            MR. McELVAIN:  No.  At least that's not what --

10           THE COURT:  I thought that's what you just said.

11           MR. McELVAIN:  My reading of the decisions is that

12   the ALJ decisions and the MAC decisions where the plaintiffs

13   have prevailed have started from the perspective of we need

14   to determine whether this person was in fact admitted.  And

15   as I mentioned, sometimes it's ambiguous.  Sometimes there's

16   one form says one thing and one that says another.  So you

17   have to sort through that factual question.  That's the

18   factual question that's reserved for the administrative

19   process.  And in sorting through that question in terms of

20   which form to give credence to over the other form, then

21   they'll look to the objective medical evidence.  That all, as

22   a matter of what Medicare understands its own policy to be,

23   is a proper application of its policy.  If the decisions go

24   any further and stop looking to whether there's an inpatient

25   admission or not and engage in a freewheeling review on their

1    own as to what was objectively reasonable, that actually is

2    not a result that Medicare would endorse.  But some of the

3    decisions can be -- has, in fact, happened in some of the

4    cases possibly, depending on how you read some of the

5    decisions.

6            THE COURT:  All right.

7            Let's see if I had anything else for you.

8            With regard to a plaintiff, like opposing counsel

9    had an example where it was on the form, he didn't get the

10   notice.  There may be a couple like that.  Those facts, at

11   this stage of the game, I need to construe in favor of the

12   plaintiff.  I need to construe those, I think, as situations

13   where there was an admission and it was taken away.  Don't I?

14   Because we're at the motion to dismiss stage.

15           MR. McELVAIN:  Referring to the case of Ms.

16   LeYanna --

17           THE COURT:  No, no.  Ms. LeYanna, that's clear.

18   They pled that.  She got the notice.  The due process issue

19   is was the notice adequate.  Opposing counsel mentioned one

20   or two other cases where it was, as she put it, a little

21   fuzzier.  And it strikes me that at a motion to dismiss

22   stage, the way I'm to read those fuzzy facts is in the

23   plaintiff's favor.  That is to say, I should construe that as

24   the plaintiffs were, in fact, admitted and then it was taken

25   away.

1    MR. McELVAIN:  I don't understand the plaintiff's to

2 be disputing that any of the beneficiaries -- I have too

3 many double negatives in that.

4    My understanding of the plaintiff's allegations is

5 they do not dispute that the Medicare Part B notice was

6 provided to all of them.

7    THE COURT:  But we're not talking about a Part B

8 notice.  We were talking about this other notice that was, in

9 fact, provided with regard to Ms. LeYanna which was something

10 in addition and different from the quarterly notice, as I

11 understand it.  She got a notice while she was in the

12 hospital about change of status.  That's not the Medicare

13 Part B notice.

14    MR. McELVAIN:  Correct, that's different.

15    I could be incorrect, but my reading of the two

16 complaints is they've only raised that issue with respect to

17 Ms. LeYanna.

18    THE COURT:  Right.  Although they've said there are

19 other situations, and I'll go back through.  All I'm trying

20 to get to understand from you is your position on the

21 question of really if there are -- so, for example, Mr.

22 Barrows had it written on the form, some form was written

23 inpatient, why at this stage of the game don't I need to

24 construe that allegation to be, yes, he was admitted as an

25 inpatient and then his status was changed?

1           MR. McELVAIN:  And that's a major part of the reason

2    why he ended up winning.

3           THE COURT:  Right.  Your position as to him is that

4    the claim is moot at this point?

5           MR. McELVAIN:  Correct.  So I think the only

6    plaintiff with a live claim is Ms. LeYanna.

7           THE COURT:  Now, of course, that could change.  We

8    haven't gotten the class certification yet, but typically

9    mootness is treated differently in in a class certification

10   context, as I'm sure you're aware.

11          And the other thing that troubles me a little bit

12   about in terms of mootness in general in a case like this, to

13   be honest with you, is you've got a class of people who by

14   definition are not only very elderly, but are very sick.  And

15   we've seen some of them die since the litigation started.

16   And so it troubles me a little to be relying too much on

17   mootness in a case like that.  I mean, this sort of brings to

18   mind the capable of repetition in a review doctrine.  Anyway,

19   I'm not really sure.  That was sort of a random thought.

20          MR. McELVAIN:  I certainly understand the Court's

21   concern, but I think if we carefully sought out first you'd

22   have the retrospective claims for benefits or hospital stays

23   that they've already experienced.  And then a claim for

24   prospective relief, nobody has alleged in a way that would

25   satisfy the standards of *City of Los Angeles v. Lyons* and the

1   recent cases in court, any likelihood or substantial almost

2   certainty of experiencing the same harm again.  We just don't

3   even get to it.

4           THE COURT:  At the end of the day, though, I'm not

5   sure that point, though technically it means that there's no

6   standing to challenge the -- to seek prospective relief, but

7   it doesn't really save me any work.  I have to go through the

8   same analysis anyway with regard to on the merits, if I

9   disagree with you on exhaustion, on the merits with regard to

10  the claims for retrospective relief.  Usually when the Court

11  makes a standing ruling, okay, I don't need to reach the

12  merits of these particular claims, they're really the same

13  claims, the same substantive claims with regard to

14  retrospective relief, aren't they?

15          MR. McELVAIN:  Correct.  That's true.

16          THE COURT:  Anything you want to add?

17          MR. McELVAIN:  Yes, your Honor.  One further point.

18  Again, returning to Ms. LeYanna's claim.  The statutory issue

19  that led to the in hospital notice of the change from

20  inpatient to observation care, as I understand it, is 42

21  U.S.C 1395(c)(c)(a)(1)(M)--

22          THE COURT:  (1) (M) as in Michael?

23          MR. McELVAIN:  Yes. Cited in our reply brief at page

24  27.

25          THE COURT:  What does that provision require?

1            MR. McELVAIN:  That requires a notice if you're

2      being -- if your level of care is being separated from

3      inpatient to a different level of care.

4            THE COURT:  That's kind of interesting, because

5      while certainly you'd hate to fault the Agency for providing

6      for such notice by making a finding against them in

7      litigation, it is sort of interesting that the Agency thought

8      it necessary to promulgate regulation requiring notice in

9      that situation, it sort of suggests the Agency recognized

10     it's a big deal when your status is changed.

11           MR. McELVAIN:  First of all, it's Congress'

12     statutory provision.

13           THE COURT:  Excuse me.  I misspoke.  I apologize.

14           MR. McELVAIN:  But it's important.  Congress chose

15     carefully what level of notice and what level of procedures

16     were required.  And, you know, obviously a large complex

17     scheme such as Medicare.  And going to the claim as to

18     whether immediate review was necessary, there's a separate

19     provision as to when expedited review is required, and that's

20     42 U.S.C. 1395ff, which says that you only are entitled to

21     expedited review when services are terminated or you're

22     discharged, which is not what we're talking about here in

23     Ms. LeYanna's care.  And I would submit that Congress made a

24     very careful decision in deciding when expedited review is

25     needed and when it's not, when there's actually an immediate

1    potential medical reason that you need an immediate

2    determination.

3            THE COURT:  How would expedited review, and I'll ask

4    your adversary about this, too, but how would expedited

5    review even work here?  I mean, somebody's coming out of the

6    hospital.  The doctor says she needs to go to a nursing home.

7    And presumably that needs to be happening pretty quickly.

8    They've come out of a major surgery, they're in a wheelchair,

9    they need IV, et cetera.  How fast could expedited review

10   happen even under the best of circumstances?

11           MR. McELVAIN:  I don't know.  And I think that's an

12   excellent reason to find why the *Eldridge* factors weren't the

13   relief that they're seeking.

14           THE COURT:  But the notice provision,

15   1395cc(a)(1)(M), I'll look at it, but I take it it doesn't

16   specify the contents of the notice.

17           MR. McELVAIN:  Plaintiffs are not alleging a

18   violation of the statute.  This portion of their claim at

19   least is purely a constitutional due process claim.

20           THE COURT:  Right.  But what's happened, I take it,

21   it, the Secretary has made a determination of what that

22   notice will say and the plaintiffs are saying it doesn't say

23   enough?

24           MR. McELVAIN:  Correct.  That's our claim.

25           THE COURT:  Anything else?

1          MR. McELVAIN:  No, your Honor.  Thank you.

2          THE COURT:  You have the last word.

3          MS. BERS:  Thank you, your Honor.

4          Counsel gave the statutory cite for the provision of

5   notice by the Utilization Review Committee when they switched

6   the status.  I can provide you the regulatory cite which is

7   42 CFR 482.30(d)(3).

8          THE COURT:  482.30(d)(3)?

9          MS. BERS:  Yes.  And that's discussed on page 38 of

10  our opposition.

11         THE COURT:  And what does that add to the statute,

12  if anything?

13         MS. BERS:  I'm not sure what it adds to the statute.

14  That is the regulatory mandate that URC provides notice when

15  they determine that admission to or continued stay in the

16  hospital is no longer necessary which apparently has been

17  interpreted to require notice when inpatient status is

18  changed to observation status.  Again, there's nothing in the

19  regulation or that statute that says observation status.

20         THE COURT:  Let me return to one of the last

21  questions I asked the Government which is how would expedited

22  review work here?

23         MS. BERS:  Yes, your Honor.  There is already an

24  expedited review system in place in hospitals for inpatients

25  who are determined that an inpatient care is no longer

```
 1    reasonable and necessary.  There is an expedited review in
 2    place.
 3              THE COURT:  And how does that work?
 4              MS. BERS:  What happens is that you're given
 5    -- inpatients are given it's called Important Message from
 6    Medicare.  It's a sheet of paper that you've given as close
 7    to admission as possible and within two days I think is what
 8    the regulation requires, at the latest.  And it lists your
 9    rights as an inpatient and it tells you how to appeal if it's
10    determined that you no longer meet the criteria for inpatient
11    status.  And what we imagine is that something very similar
12    could be given to patients who are in observation status.
13    Important Message from Medicare, your rights as a Medicare
14    observation status patient.  And people are allowed -- for
15    the inpatient review, there is an expedited review system
16    where they can call a contractor, a Medicare contractor, I
17    believe it's by midnight of the day of discharge, and they
18    can appeal that determination right there, that we imagine
19    that kind of system being applied.
20              THE COURT:  Let me make sure I got this right.  I'm
21    admitted to the hospital for a procedure.  There's no
22    question, the doctor admits me.  And then before or after the
23    procedure, while I'm still inpatient, I get this notice that
24    says, you know what, Medicare thinks it was a mistake to
25    admit you and you're not going to be admitted --
```

1          MS. BERS:  Or you're no longer meeting the

2     criteria.

3          THE COURT:  You're no longer meeting the criteria.

4     So I or my spouse can pick up the phone and call and they're

5     going to get, if you will, a mini hearing, and that all can

6     happen while I'm still in the hospital bed.

7          MS. BERS:  Yes.  And that does happen.  And people

8     are actually afforded financial liability protection until

9     they get the decision from that initial contractor.  And then

10    there's even a second level of expedited review where there's

11    also some financial protection, and they can also get another

12    quick decision.

13         THE COURT:  And Congress has expressly provided for

14    expedited review of that type of determination but,

15    obviously, not for the one that you're seeking?

16         MS. BERS:  Well, they've provided for expedited

17    proceedings for people in those inpatient type of situations

18    that exists for hospitals, it exists for nursing homes.  And

19    it applies to people in these kind of vulnerable time

20    sensitive situations.  We think that that statute also

21    applies to people in this very vulnerable time sensitive

22    situation of being either classified as observation status

23    initially or being switched to observation status.  Even if

24    not literally stated in the statute, due process certainly

25    requires the kind of notice and review the plaintiffs are

1     requesting.

2            THE COURT:  Okay.  What else?

3            MS. BERS:  I would say with regard to the class

4     certification, the Second Circuit has the relation back

5     doctrine in the filing of the complaint in the *Robichaux*

6     (ph) case is very informative about that.

7            And what your Honor said about this being in the

8     motion to dismiss stage, the plaintiffs have alleged

9     sufficient facts and they need to be viewed in a favorable

10    light to the plaintiffs.  That we have sufficiently alleged

11    those facts to get beyond the motion to dismiss.

12           And we haven't talked about discovery, but there's a

13    pending motion to stay discovery.  We would simply ask if the

14    Court does deny the motion to dismiss, that discovery be

15    allowed to proceed in some reasonable time after that.  The

16    discovery has been effectively stayed.  But there are some

17    significant factual disputes, particularly with regard to the

18    notice and review issues where discovery could be very

19    helpful.

20           THE COURT:  All right.  Very well.

21           Thank you for the argument today.  It was well

22    presented by both sides.  I'm going to have to take this

23    under advisement and I will do my best to get a prompt ruling

24    out.  Obviously, this is important to the parties and I

25    appreciate your input.

1          So we stand in recess.

2          (Concluded.)

3

4

5                    C E R T I F I C A T E

6

7          I, Martha C. Marshall, RMR, CRR, hereby certify that

8    the foregoing pages are a complete and accurate transcription

9    of my original stenotype notes taken in the matter of Richard

10   Bagnall, et al v. Kathleen Sebelius, which was held before

11   the Honorable Michael P. Shea, U.S.D.J, at 450 Main Street,

12   Hartford, Connecticut, on May 3, 2013.

13

14

15

16                        _____
                          Martha C. Marshall, RMR,CRR
17                        Official Court Reporter

18

19

20

21

22

23

24

25