UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHRISTINA ALEXANDER, *et al.*,<br><br>  Plaintiffs,<br>v.<br><br>THOMAS E. PRICE, Secretary of Health and Human Services,<br><br>  Defendant. | No. 3:11-cv-1703 (MPS) |

## RULING ON CLASS CERTIFICATION

### I. INTRODUCTION

This case is about whether Medicare beneficiaries have a right to administrative review of the decision to treat their hospital stays as "observation" rather than "inpatient"—a decision that can have significant financial consequences. After surviving summary judgment and two motions to dismiss, plaintiffs now move to certify a class under Federal Rule of Civil Procedure 23(b)(2). (ECF No. 203.) The Secretary of the Department of Health and Human Services (the "Secretary") contests class certification and raises a number of specific issues regarding the scope of the class definition. For the reasons explained below, the Court grants in part and denies in part the motion for class certification, and appoints plaintiffs' counsel as class counsel.

### II. BACKGROUND

The Court assumes the parties' familiarity with the facts and procedural history of this case, which are also described in the February 8, 2017 ruling on cross-motions for summary judgment and the second motion to dismiss. *Alexander v. Cochran*, 2017 WL 522944 (D. Conn. 2017). Plaintiffs now move to certify a class under Federal Rule of Civil Procedure 23(b)(2). (ECF No.

1

203.) The parties presented oral argument at hearings on June 13 and June 28, 2017, and submitted extensive briefing on the issue. (ECF Nos. 213; 219; 230; 234; 235; 239; 240.)

**III.  LEGAL STANDARD**

The party seeking class certification must satisfy the requirements of Federal Rule of Civil Procedure 23. Rule 23(a) requires a showing that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." In addition to these four explicit conditions, the Second Circuit has recognized an implied requirement that the class be ascertainable, that is, "defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 2017 WL 2883874, at *1 (2d Cir. 2017).

Plaintiffs also must satisfy one of the three paragraphs of subsection (b) of Rule 23. Here, because plaintiffs seek to certify a class under Rule 23(b)(2), they must demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).

**IV.  CLASS DEFINITION**

The parties primarily dispute the language and scope of the class definition, and thus the Court begins with that set of issues.[1] The plaintiffs propose a class of:

---

[1] The Court has previously addressed the Secretary's standing and mootness challenges to this action, which he invokes again in his brief opposing class certification. *See Alexander*, 2017 WL 522944, at *4-6.

2

> All Medicare beneficiaries who, on or after January 1, 2009, have had or will have had any portion of a stay in a hospital treated as observation status and therefore not covered under Medicare Part A.

The Secretary argues that this definition is overly broad and instead proposes a class (should any class be certified) of:

> All Medicare beneficiaries who, on or after January 1, 2009: (1) have received or will have received observation services during a hospitalization; and (2) have received or will have received an initial determination that the observation services are covered (or subject to coverage) under Medicare Part B; and (3) have received or will have received post-hospitalization care in a skilled nursing facility that was not covered by Medicare because either (a) the individual received an initial determination denying coverage or (b) neither the facility or the individual sought Medicare coverage for such care. Medicare beneficiaries who meet the requirements of the foregoing sentence but received a final decision of the Secretary before September 4, 2011 are excluded from this definition.

For the reasons explained below, the Court adopts the following class definition:

> All Medicare beneficiaries who, on or after January 1, 2009: (1) have received or will have received "observation services" as an outpatient during a hospitalization; and (2) have received or will have received an initial determination that the observation services are covered (or subject to coverage) under Medicare Part B. Medicare beneficiaries who meet the requirements of the foregoing sentence but who pursued an administrative appeal and received a final decision of the Secretary before September 4, 2011 are excluded from this definition.

### A. Observation Status or Services

First, the parties disagree about whether the class definition should refer to "observation status" or "observation services." Plaintiffs argue that the term "observation services" is misleading because there is no distinguishable set of medical services considered to be "observation"—it is just a billing distinction. Plaintiffs add that they would not be opposed to substituting the term "outpatient status" for "observation status." (ECF No. 219 at 14.)

The Court finds that, for clarity, the class definition should refer to "'observation services' as an outpatient" rather than "observation status." The Court understands the plaintiffs' concerns: the Secretary has acknowledged that *any* medical service or treatment rendered to a patient who is

not formally admitted as an inpatient can be viewed as an observation service. (ECF Nos. 164-1 ¶ 6; 176-1 ¶ 6.) However, "observation services" and "outpatient observation services" are the terms used in the Medicare Benefit Policy Manual, Ch. 6 § 20.6(A). "Observation services" is also the term used in the NOTICE Act, which provides that within 36 hours, hospitals must explain "the status of the individual as an outpatient receiving observation services and not as an inpatient of the hospital." 42 U.S.C. § 1395cc(a)(1)(Y). The standardized Medicare Outpatient Observation Notice ("MOON") that hospitals must give to patients under the NOTICE Act reads, "You're a hospital outpatient receiving observation services. You are not an inpatient because:" 81 Fed. Reg. 57038 (Aug. 22, 2016); *see also* MOON, available at Centers for Medicare & Medicaid Services, "Beneficiary Notice Initiative (BNI)," www.cms.gov/Medicare/Medicare-General-Information/BNI (last accessed July 7, 2017).

And using only the term "outpatient status," without any mention of observation, as plaintiffs suggest as an alternative, would be improper. "Outpatient status" encompasses too broad a group of individuals, beyond the plaintiffs' original class definition and the allegations in the complaints, which focus on observation status/services. *See, e.g.* ECF No. 1 ¶¶ 2-8; *see also* Medicare Benefit Policy Manual, Ch. 6 §§ 20.1-20.7 (describing different outpatient hospital services, including but not limited to observation).

### B. Presentment

Next, the parties disagree about how to ensure that the class definition includes only those individuals who have presented their claim to the agency as required by 42 U.S.C. § 405(g) ("Section 405(g)"). Plaintiffs argue that presentment occurs when a Medicare beneficiary arrives at a hospital for care and shows evidence of coverage, with no action by the Secretary required. While this may technically be correct, the Court concludes that the class should be defined to

4

include individuals who "have received or will have received an initial determination that the observation services are covered (or subject to coverage) under Medicare Part B."[2] Including this "initial determination" requirement in the definition resolves any doubt about the Court's jurisdiction.

Section "405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." *Heckler v. Ringer*, 466 U.S. 602, 615 (1984). Section 405(g) "contains the nonwaivable and nonexcusable requirement that an individual present a claim to the agency before raising it in court." *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 15 (2000). While, earlier in this litigation, the Court held that Section 405(g)'s *exhaustion* requirement was subject to judicial waiver, *Bagnall v. Sebelius*, 2013 WL 5346659, at *6-7 (D. Conn. 2013), it is clear that the presentment requirement is non-waivable. "Section 405(g) does not authorize jurisdiction over the claims of … passive persons." *Clark v. Astrue*, 274 F.R.D. 462, 467 (S.D.N.Y. 2011).

Plaintiffs are correct that courts have taken a pragmatic view of Section 405(g)'s presentment requirement, and have generally emphasized the actions of the person seeking benefits, rather than the agency. "The jurisdictional presentment requirement is easily satisfied, and requires only that a claimant made a formal or informal request for benefits." *Mai v. Colvin*, 2015 WL 8484435, at *2 (E.D.N.Y. 2015) (citation and quotation marks omitted). In *Mai*, the district court found that filing an application for Supplemental Security Income qualified as presentment. In *Heckler v. Ringer*, the Supreme Court held that plaintiffs "satisfied the nonwaivable requirement by presenting a claim for reimbursement for the expenses of their…

---

[2] The parties agreed at oral argument that both a Medicare Summary Notice and a MOON would qualify as "initial determinations."

surgery." 466 U.S. at 617. *See also City of N.Y. v. Heckler*, 742 F.2d 729, 735 (2d Cir. 1984) ("Prior to the Secretary's decision to terminate benefits, every class member completed a Social Security questionnaire indicating in writing that he remained disabled and desired benefits…. the submission of the disability questionnaire satisfied the presentment requirement."); *Maynard v. Comm'r*, 2015 WL 4069356, at *1–2 (E.D.N.Y. 2015) (presentment satisfied where the plaintiff requested benefits by contacting an employee at the social security office).

However, even if not technically required by Section 405(g), including an "initial determination" requirement in the class definition would eliminate any uncertainty about the Court's jurisdiction. Receipt of an initial determination of Medicare Part B coverage via a Medicare Summary Notice, MOON, or otherwise serves as evidence that the claimant requested coverage in the first place. As one court reasoned, "[t]here can be no doubt that the members of the plaintiff class, who by definition have had claims for Medicare benefits denied by the Secretary, have satisfied the presentment requirement." *Fox v. Bowen*, 656 F. Supp. 1236, 1243 (D. Conn. 1986).[3] And to the extent that there is ambiguity about whether presentment does require "some decision by the Secretary," this initial determination would still be sufficient. *See Mathews v. Eldridge*, 424 U.S. 319, 328 (1976) ("The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary. Absent such a claim there can be no 'decision' of any type. And some decision by the Secretary is clearly required by the statute.")

Finally, including an initial determination requirement in the class definition is practical: it makes identification of class members easier while not actually limiting class membership.

---

[3] Although a determination of coverage under Part B is not the same as a denial, it serves the same function for purposes of the presentment requirement in this case. As discussed in previous rulings, coverage under Part B, in the circumstances facing the plaintiffs, caused them to incur substantially more out-of-pocket costs than if the Secretary had determined they were covered under Part A. *See Alexander*, 2017 WL 522944, at *6.

Plaintiffs have stated that "even under the Secretary's own terms, all members of the [plaintiffs'] proposed class will have presented their claims," because "[a]ll class members under plaintiffs' class definition have received or will receive a Medicare Summary Notice." (ECF No. 219 at 13.)

### C. Statute of Limitations

The parties also dispute whether individuals who received a final decision of the Secretary before September 4, 2011, should be excluded from the class due to the statute of limitations, or whether the statute of limitations should be equitably tolled. The Court concludes that equitable tolling is not warranted and thus that the class definition should include the Secretary's proposed time restriction.

Under Section 405(g), an individual must bring a civil action to challenge a final decision of the Secretary within sixty days. The sixty-day appeal requirement is not jurisdictional, and equitable tolling may apply. "[T]he doctrine of equitable tolling permits courts to deem filings timely where a litigant can show that he has been pursuing his rights diligently and that some extraordinary circumstance stood in his way." *Torres v. Barnhart*, 417 F.3d 276, 279 (2d Cir. 2005) (citation and quotation marks omitted). Courts have found equitable tolling to be warranted where "there was evidence of (1) systematic misapplication of the law; (2) concealment which prevented beneficiaries from knowing of a violation of rights; and (3) 'unusual' protectiveness for disability claimants." *Pavano v. Shalala*, 95 F.3d 147, 152 (2d Cir. 1996) (citations omitted).

In this case, the statute of limitations would bar a very small group of individuals, if anyone. At oral argument, the parties agreed that to receive a "final decision," an individual must pursue an administrative appeal through multiple levels and ultimately obtain a ruling from the Medicare Appeals Council. Given the lack of any formal administrative appeals process for beneficiaries seeking to challenge their Medicare Part B coverage, *see Alexander*, 2017 WL 522944 at *18, it is

7

unlikely that many potential class members would have received a final decision of the Secretary before September 4, 2011, concerning hospitalizations on or after January 1, 2009. The experience of Dorothy Goodman's son illustrates this point: he allegedly attempted to challenge her coverage determination by communicating with the hospital, the skilled nursing facility, the Centers for Medicaid and Medicare Services ("CMS") regional office, the state Medicare counseling office, and a Medicare contractor; none could provide him with a "clear method of addressing or challenging his mother's hospital classification." (ECF No. 123 ¶¶ 85-98.) He ultimately contacted his congressperson, which led CMS's regional office to steer him to some "redetermination" forms that he used. (*Id.*) Even then, however, he did not secure a review of the merits of the denial of Part A coverage by the Medicare Appeals Council. (*Id.*)

For the narrow subset of potential class members who did manage to receive a final decision of the Medicare Appeals Council between January 1, 2009, and September 4, 2011, plaintiffs have not met their burden to justify equitable tolling. The plaintiffs argue for equitable tolling because proposed class members had no reason to know they were receiving observation services, why, or what the avenue of appeal might be. However, parts of this argument simply do not apply to an individual who did somehow manage to appeal all the way through the process: presumably such a person would have known their coverage status, would have discovered an avenue of appeal, and would have contested the coverage determination based on evidence available to them. Although such an individual might not have known about the commercial screening tool criteria,[4] by definition, that ignorance did not prevent the individual from contesting

---

[4] Commercial screening tool criteria are important to this case primarily because plaintiffs argue that such criteria may contribute to the creation of a protected property interest giving rise to a due process right to administrative appeal, not because the government has concealed the tools' existence or applying the tools is in itself a violation of the law. *See Alexander*, 2017 WL 522944, at *10-11.

8

the government's action through the administrative appeals process. Such individuals' failure to proceed to court in a timely manner is thus not comparable to the situation of plaintiffs who were lulled into sleeping on their rights by the sort of government "concealment" and "systematic misapplication of the law" found to justify equitable tolling in other cases. *See Pavano*, 95 F.3d at 152 (citing *Bowen v. City of N.Y.,* 476 U.S. 467 (1986) and *Dixon v. Shalala*, 54 F.3d 1019 (2d Cir. 1995)).

### D. Skilled Nursing Facility Care

The parties also dispute whether the class definition should include a limitation related to skilled nursing facility ("SNF") care. All named plaintiffs in this case received care at a skilled nursing facility after their hospitalization, and, as their hospital stays were not covered under Medicare Part A, they had to pay for that care out of pocket. The Secretary argues that, because of this, named plaintiffs' claims are not typical of individuals who did not, or will not, receive SNF care, and the class should exclude such "non-SNF" individuals. *See* Rule 23(a)(3) (Class action only permitted if "the claims or defenses of the representative parties are typical of the claims or defenses of the class.") The Court considered this argument carefully, including asking the parties to submit supplemental briefing on possible subclassing. (ECF Nos. 239; 240.) Ultimately, as explained below, the Court concludes that while the named plaintiffs are not perfect representatives of all the different interests at issue in this case, their claims are typical. The proposed class also meets Rule 23(a)'s commonality and adequacy requirements and satisfies Rule 23(b)(2). Further, at this stage of the litigation, continuing with the full proposed class serves the interests of judicial economy. Therefore, the Court will not narrow the class definition as the Secretary suggests.

First, the Secretary argues that the named plaintiffs' claims are not typical because they suffered greater financial harm than individuals who only incurred in-hospital costs and did not receive SNF care. The named plaintiffs allegedly incurred SNF costs ranging from $3,965 to $30,400. (ECF Nos. 1 ¶¶ 59, 70, 76, 81, 87, 93; 53 ¶¶ 60, 75, 80, 84, 90.). The in-hospital costs for several named plaintiffs, on the other hand, ranged from $335 to $825. (ECF Nos. 1. ¶¶ 58, 63, 69, 80, 86, 92; 53 ¶¶ 59, 65.) But despite these potential cost differences, the named plaintiffs' claims are typical of those who only incurred in-hospital costs. Several named plaintiffs incurred the same costs (*id.*) and while the total economic harm they suffered may be greater than many who merely incurred in-hospital costs, limitations on the Court's ability precisely to identify the quantity of relative economic harm (considering, for example, overall wealth) make gradations in economic harm a poor basis to deny class certification to a subgroup of potential class members. *See also Easterling v. Connecticut, Dep't of Correction*, 265 F.R.D. 45, 52 (D. Conn. 2010) ("Differences in the degree of harm suffered… do not vitiate the typicality of a representative's claims") (citation and quotation marks omitted), *modified*, 278 F.R.D. 41 (D. Conn. 2011).

Second, the Secretary argues that the named plaintiffs' claims are not typical because the difference in cost could affect the outcome of the *Mathews v. Eldridge* balancing test, as named plaintiffs would have a greater "private interest" than the non-SNF individuals. It is correct that, if the Court ultimately finds that there is state action and a property interest in this case, it will need to determine the amount of process due. This requires balancing "the private interest that will be affected by the official action," "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and "the Government's interest, including the function involved and the fiscal and administrative

burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

However, the Court finds the Secretary's private interest argument unpersuasive, because even small dollar amounts can create an important private interest under *Mathews*, and would vary from person to person regardless of the scope of the class definition. As noted, the in-hospital costs for named plaintiffs ranged from $335 to $825. Costs of that size, or smaller, can carry great significance depending on an individual's resources and family circumstances, especially in the context of health care for seniors. *See, e.g. Kapps v. Wing*, 404 F.3d 105, 118 (2d Cir. 2005) ("[T]he importance of the private interest at stake in this case is high. While [Home Energy Assistance Program] grants are small in dollar amounts, they are targeted to those households that 'are among the poorest in America.") (citation and quotation marks omitted); *David v. Heckler*, 591 F. Supp. 1033, 1041 (E.D.N.Y. 1984) (For class of Medicare beneficiaries, "[t]he private interest remains the same—the claimant's need to obtain reimbursement for medical bills that he or she has already paid. The amounts involved may sometimes appear small, but to an elderly person living on a fixed income, they loom relatively large."). While the costs borne by different class members may vary, they share a private interest under *Mathews* in obtaining an administrative appeals process to challenge those costs.

Third, the Secretary argues that the named plaintiffs' claims are not typical because individuals who did not, or will not, need SNF care do not have the same interest in an *expedited* review process. It is true that plaintiffs have emphasized that an expedited administrative appeals process is important because it would give SNF-eligible individuals the ability to challenge their observation placement *before* incurring high SNF costs. They have noted that the lack of expedited administrative review can force individuals who need SNF but cannot afford it to forgo critical

11

care. For individuals making the weighty decision of whether to seek SNF care after a hospitalization, the additional procedural safeguard of expedited review could be more valuable, and thus could receive significant weight in the *Mathews v. Eldridge* balancing test.

The Court agrees that the issue of expedited review is one for which the named plaintiffs may not be perfect representatives of all members of the class, but their claims are still typical, and they are likely the best representatives available for the group of persons who reach the point of deciding whether to enter SNF care after a hospitalization (the individuals who might be most in need of expedited review, according to the Secretary's logic). While the named plaintiffs themselves no longer have a need for an expedited appeal,[5] it would be virtually impossible to find a named plaintiff who did, because that status would be too transitory to endure for the time necessary to adjudicate a class action. Generally, to obtain Medicare coverage of SNF care, beneficiaries must receive the care within 30 days of discharge from the hospital. 42 C.F.R. § 409.30(b). Because the named plaintiffs *were* in that position, however, they are able to represent such individuals. For example, Nettie Sapp's family allegedly paid $9,200 for skilled nursing facility care not covered by Medicare for nearly two months. (ECF No. 1 ¶ 87.) When her family could no longer afford that care, they moved her to an assisted living facility, where she died. (*Id.*) The representative of Ms. Sapp's estate—a named plaintiff—would thus be well-positioned to press the argument about the need for expedited review.

Fourth, though the Secretary did not specifically raise Rule 23 issues other than typicality in his brief, and though "[t]he commonality and typicality requirements of Rule 23(a) tend to merge," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, n.5 (2011), the Court also specifically

---

[5] The parties have pointed out that, if the plaintiffs ultimately prevail in this case, named plaintiffs and other class members who received observation services in the past would be able to seek (presumably non-expedited) administrative review related to past out-of-pocket costs.

considered whether including non-SNF individuals in the proposed class would violate Rule 23(a)'s commonality requirement. Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." "Consideration of this requirement obligates a district court to determine whether plaintiffs have suffered the same injury." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 84 (2d Cir. 2015) (citation and quotation marks omitted). Here, the proposed class shares common questions of both law and fact. All proposed class members, regardless of SNF care, have core factual questions in common, such as "How is the inpatient status determination made within hospitals?" and "To what extent does CMS influence hospital decision-making?" The fundamental legal questions in this case are also common, for example: "Do Medicare beneficiaries has a protected property interest in being treated as inpatients in the hospital?" "Does the inpatient vs. observation decision constitute state action?" All of these questions are best suited for class-wide resolution. Ultimately, regardless of SNF care, the named plaintiffs and all proposed class members have "suffered the same injury," namely the lack of an administrative appeals process to challenge their observation placement. *Sykes*, 780 F.3d at 84 (citation and quotation marks omitted).

Fifth, the Court considered whether named plaintiffs satisfy Rule 23(a)'s adequacy requirement. "Adequacy entails inquiry as to whether… plaintiff's interests are antagonistic to the interest of other members of the class." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation and quotation marks omitted). Here, the named plaintiffs are plainly adequate representatives of the class, including even non-SNF individuals. Their interests are not antagonistic but shared: they all seek relief in the form of an administrative review process to recover costs not covered by Medicare.

13

Sixth, the Court considered whether including non-SNF individuals in the class would be inconsistent with Rule 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. In this case, plaintiffs seek a single injunction "ordering defendant… to establish a procedure for administrative review of a decision to place a Medicare beneficiary on observation status, including the right to expedited review." (ECF No. 1 at 28-29.) At least at this stage in the litigation,[6] this "proposed injunctive relief sweeps broadly enough to benefit each class member." *Sykes*, 780 F.3d at 97. Regular administrative review, expedited review, or some combination of the two would benefit all proposed class members who currently lack *any* way to challenge their observation placement. "Relief to each member of the class, does not require that the relief to each member of the class be identical, only that it be beneficial." *Id.* (citation, quotation marks, and alteration omitted).

Finally, apart from the Rule 23 requirements, the Secretary urges the Court to exercise its discretion to limit the class to individuals who did not receive SNF care, because "[p]laintiffs should not be permitted to substantially expand the scope of the class." (ECF No. 213 at 6.) However, the Court finds that the interests of judicial economy favor proceeding with the class without any SNF restriction. The Secretary has been aware, from the time of the first complaint, that the plaintiffs' proposed class included "all" Medicare beneficiaries who had "any portion of a stay in a hospital treated as observation status," not only those who later sought SNF care. (ECF

---

[6] It would be premature to make a determination at this stage that certain individuals would merit expedited review, while others would not. As plaintiffs pointed out at oral argument, even individuals who were not eligible for SNF care could have reasons to argue for an expedited appeal process, such as the high cost of self-administered drugs in the hospital. Further, even if no expedited review is ultimately ordered, all class members would benefit from some review process, even it was not expedited. Finally, it is also possible that no class members would merit any review at all.

14

No. 1 ¶ 19.) Indeed, several of the existing named plaintiffs specifically alleged in-hospital costs. (ECF Nos. 1. ¶¶ 58, 63, 69, 80, 86, 92; 53 ¶¶ 59, 65.) The case is now nearly six years old with a significant procedural history. The parties have conducted extensive discovery on factual issues shared by the entire proposed class. And both this Court and the Court of Appeals have addressed legal issues common to all proposed class members that remain best suited for class-wide resolution.

With all of that said, and while certification of a class including non-SNF individuals is by no means an interim decision, it remains possible that the Court will need to revisit the class definition at a later stage of this litigation. A district court "can always alter, or indeed revoke, class certification at any time before final judgment is entered." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104, n..9 (2d Cir. 2007); *see also* Fed. R. Civ. P. 23(c)(1)(C); *Brown v. Kelly*, 609 F.3d 467, 486 (2d Cir. 2010) (District courts "possess[] tools with which to manage the individualized inquiries that [an] action may require, including creating subclasses.") If, in the future, it becomes apparent that different types of Medicare beneficiaries have factual circumstances that would make them eligible for different forms of relief, the Court could consider, for example, creating subclasses to resolve "[d]ifferences in the type of relief sought," Newberg on Class Actions § 3:42 (5th ed.), and "to conduct the trial in a more orderly manner, by tying the order of proof to particular claims raised by the individual subclasses." *Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997).

## V. CLASS CERTIFICATION

As revised, the class meets the requirements for certification under Rule 23(a) and (b)(2).

### A. Numerosity

The first requirement of Rule 23(a) is that "the class [be] so numerous that joinder of all members is impracticable." In the Second Circuit, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Other considerations include "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

The numerosity requirement is easily satisfied in this case. Plaintiffs have provided evidence that the class would number in at least the hundreds of thousands. For example, a 2012 study by researchers at Brown University identified 918,180 Medicare beneficiaries who received observation services in 2009. (ECF Nos. 203-1 at 20; 213 at 6.) The class is also geographically dispersed across the country and consists of individuals who by definition are elderly and/or disabled and have been hospitalized at some point after January 1, 2009, making joinder impracticable. Indeed, the Secretary does not contest numerosity. (ECF No. 213 at 6, n.3.)

### B. Commonality and Typicality

Rule 23(a) also requires that "there [be] questions of law or fact common to the class" and "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "The commonality and typicality requirements of Rule 23(a) tend to merge." *Dukes*, 564 U.S. at 350 n.5 (citation and quotation marks omitted). "Consideration of this requirement obligates a district court to determine whether plaintiffs have suffered the same injury." *Sykes,* 780 F.3d at 84 (citation and quotation marks omitted). The claim "moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity

will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

Here, both the commonality and the typicality requirements are met. All named plaintiffs and proposed class members suffered (or will suffer) the same injury: the lack of an administrative appeals process to challenge their observation placement, and attendant financial consequences. As discussed earlier in Section IV.D., differences among class members depending on whether they received SNF care do not "vitiate the typicality of a representative's claims." *Easterling*, 265 F.R.D. at 52 (citation and quotation marks omitted). The issue at the heart of this case is whether the Secretary's failure to provide an administrative appeals process for Medicare beneficiaries who receive "observation services" violates the due process clause. This issue is one faced by all named plaintiffs and proposed class members, involves common questions of both law and fact, and is best suited for classwide resolution.

### C. Adequacy

The fourth and final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." "Adequacy entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings*, 574 F.3d at 35 (citation and quotation marks omitted).

The adequacy requirement is satisfied by the fourteen named plaintiffs. The Secretary does not contest this generally, but argues that Richard Bagnall, Florence Coffey, Loretta Jackson, and Charles Holt (or their estate representatives) cannot adequately represent the class because their claims are still pending in the administrative process. However, as detailed in plaintiffs' reply memorandum, these four individuals struggled to find a way to appeal, given the lack of an official

17

process. (ECF No. 219 at 5-7.) Three have received no concrete response from the Secretary and have essentially hit dead ends. As for the fourth, Mr. Bagnall, his estate expects to receive a final decision similar to that received by other named plaintiffs—stating that under CMS Ruling 1455-R, Medicare beneficiaries may not appeal their placement on observation status. *See Alexander*, 2017 WL 522944, at *18. All four would benefit from an official administrative appeals process, making this a case where "the representative who defends his own interests will also be protecting the interests of the class." *Consol. Rail Corp,* 47 F.3d at 484. On the whole, the named plaintiffs' interests are not antagonistic to members of the class: they seek relief in the form of an official administrative appeals process that would benefit named plaintiffs as well as absent class members. *See also* Section IV.D., *supra*.

Plaintiffs' attorneys are also more than adequate. As detailed in Section VI, they are qualified, have extensive experience litigating cases on behalf of Medicare beneficiaries, and have ably handled the litigation thus far.

### D. Ascertainability

In addition to the four explicit requirements of Rule 23(a), the Second Circuit has recognized an implied requirement of ascertainability. "The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 2017 WL 2883874, at *12. "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.*

The ascertainability requirement is met here. The class is defined with objective criteria, including the individual's status as a Medicare beneficiary, the date of hospitalization, and an

initial determination that the hospital services were observation services covered under Medicare Part B. These criteria create clear boundaries for class membership.

### E. Rule 23(b)(2)

Plaintiffs seek to certify the class under Rule 23(b)(2). Under Rule 23(b)(2), a class action may be maintained only if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "[C]ertification of a class for injunctive relief is only appropriate where a single injunction would provide relief to each member of the class." *Sykes*, 780 F.3d at 80 (citation, alteration, and quotation marks omitted).

The revised class meets Rule 23(b)(2)'s requirements. The plaintiffs challenge the Secretary's failure to provide an administrative appeals process and seek an injunction, "ordering defendant… to establish a procedure for administrative review of a decision to place a Medicare beneficiary on observation status, including the right to expedited review." (ECF No. 1 at 28-29.) That injunction would provide relief to the class as a whole by providing an opportunity to challenge their placement decisions via a regular or expedited administrative appeals process. *See also* Section IV.D, *supra.*

## VI. CLASS COUNSEL

Having determined that class certification is appropriate, the Court must also appoint class counsel to fairly and adequately represent the class. Under Rule 23(g), courts must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that

counsel will commit to representing the class." Courts may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id.*

The Court appoints plaintiffs' counsel, the Center for Medicare Advocacy, Inc., Justice in Aging, and Wilson, Sonsini Goodrich & Rosati, as class counsel in this case. Counsel have demonstrated their experience and expertise in handling complex Medicare cases. They have dedicated careful work to this case over the past five and half years, including a successful appeal to the Second Circuit. And they have experience in other cases representing Medicare beneficiaries, including class actions. (*See* list of cases at ECF Nos. 203-1 at 21, n.8; 234 at 3-4; 235-1 at 3-4.) As two national public interest organizations and a private law firm, counsel have already committed considerable resources to this case, and have represented that they will continue to do so. The Secretary does not object to their appointment.

## VII. CONCLUSION

For the reasons explained above, plaintiffs' motion for class certification (ECF No. 203) is GRANTED in part and DENIED in part. The Court hereby appoints plaintiffs' counsel as class counsel and orders that the following Rule 23(b)(2) class be certified:

> All Medicare beneficiaries who, on or after January 1, 2009: (1) have received or will have received "observation services" as an outpatient during a hospitalization; and (2) have received or will have received an initial determination that the observation services are covered (or subject to coverage) under Medicare Part B. Medicare beneficiaries who meet the requirements of the foregoing sentence but who pursued an administrative appeal and received a final decision of the Secretary before September 4, 2011 are excluded from this definition.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           July 31, 2017